## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

VOTE.ORG; FLORIDA ALLIANCE
FOR RETIRED AMERICANS;
FLORIDA STATE CONFERENCE OF
BRANCHES AND YOUTH UNITS OF
THE NAACP; and DISABILITY
RIGHTS FLORIDA,

*Plaintiffs*,

v.                                                                         No. 4:23-cv-00111-AW-MAF

CORD BYRD, in his official capacity as
Secretary of State of Florida, et al.,

*Defendants*,

REPUBLICAN NATIONAL
COMMITTEE and REPUBLICAN
PARTY OF PASCO COUNTY,

*Intervenor-Defendants*.

## INTERVENORS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT & MEMORANDUM IN SUPPORT

Intervenors—the Republican National Committee and Republican Party of

Pasco County—move to dismiss Plaintiffs' First Amended Complaint (Doc. 101) under

Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

1

# INTRODUCTION

Original-signature requirements, like the one at issue in this case, are ubiquitous in American life. Every American filing a paper tax return must sign the return with an original, handwritten signature. *See* IRS, *1040 (and 1040-SR): Instructions* 61 (2022), https://perma.cc/Z9YR-X2DJ. Most Americans file online tax returns that require an electronic signature,[1] just as most Floridians register to vote at the DMV with an electronic signature.[2] But those who file their tax returns on paper must physically sign the return, just as Floridians who register to vote on paper must physically sign the application. Those dual procedures are commonplace and commonsense: electronic signatures accompany electronic documents, and physical signatures accompany physical documents. The growing availability of electronic verification has not rendered physical signatures obsolete. Rather, absent the security benefits provided by electronic signature verification, traditional safeguards such as original, handwritten signatures are reasonable measures to verify information and ensure security on paper documents.

Hence, original signatures remain a fixture of American life. Florida corporations must sign their income tax returns with an original signature. Fla. Dep't of Revenue, *Instructions for Corporate Income/Franchise Tax Return* 6 (2022), https://perma.cc/7VBQ-MZTJ. Educators seeking certification to teach in Florida public schools must subscribe

---

[1] IRS, *Returns Filed, Taxes Collected & Refunds Issued* (Apr. 14, 2023), https://perma.cc/93H5-F2C3.
[2] *See* Fla. Div. of Elections, *Voter Registration - Method and Location* (June 20, 2023), https://perma.cc/K6MC-9ALS.

an affidavit "by original signature or by electronic authentication." Fla. Stat. §1012.56(2)(b). Courts in this State—including this one—also require original signatures in some circumstances. *See* Local Rule 5.1(E) (requiring pro se parties to "include a signature block with the party's handwritten signature" on documents filed with this Court). And many States require original signatures at various stages of the voting process. *See, e.g.*, Wash. Rev. Code §29A.40.110(3); Colo. Rev. Stat. §31-10-910.3; Me. Const. art. IV, pt. 3, §20; Ohio Rev. Code §3501.011(A).; Or. Rev. Stat. §250.043(1)(a); N.J. Stat. §19:31A-8; Ne. Rev. Stat. §32-631; Tex. Elec. Code §13.002.

Like so many of its sister States, Florida also requires original signatures at various stages of the election process. Since at least 1868, the Florida Constitution has required citizens registering to vote to "subscribe" an oath to support and defend the United States and Florida Constitutions. *See* Fla. Const. art. XIV, §1 (1868); Fla. Const. art. VI, §3 (1968). Today, electors can petition for removal of members of governing municipal bodies only by providing an "original signature" in "ink or indelible pencil." Fla. Stat. §100.361(2)(e). Ballot initiative petitions require "the original signature of the purported elector." Fla. Stat. §100.371(11)(a)(1). Candidate petitions to gain ballot access also require a "voter's original, ink signature." Fla. Admin. Code r. 1S-2.045(5)(f)(4).

And in 2005, the Florida Legislature amended the Florida Voter Registration Act, section 97.053(5)(a)(8), to clarify that a voter registration application is complete only if it contains an "original signature" or a "digital signature transmitted by the Department

of Highway Safety and Motor Vehicles" (DMV). 2005 Laws of Fla. ch. 278, §6. Both types of signatures are used for the purpose of the applicant "swearing or affirming" that the information "contained in the registration application is true," that the applicant is qualified to register as an elector under the laws and Constitution of Florida, and that the applicant subscribes to the oath required by the Florida Constitution that he will protect and defend the United States and Florida Constitutions. Fla. Stat. §97.053(5)(a)(8). In 2015, the Legislature created Florida's online voter registration portal that uses the DMV digital signatures on file for individuals with a Florida driver's license or Florida identification card. 2015 Laws of Fla. ch. 36, §1.

Plaintiffs challenge only the requirement that an applicant must provide an original signature to register to vote, unless the DMV has an electronic signature on file. This requirement affects only a narrow set of voter registration applicants.

Florida offers many secure, convenient ways to register to vote. The first registration option allows any applicant to register in-person at a DMV office when applying for, renewing, or updating her address on an existing Florida driver's license or Florida identification card. Fla. Stat. §97.057(1). All the applicable information collected by the DMV during this process is transferred to the voter registration application and is used to establish the applicant's eligibility under Florida law. *Id.* §97.057(2)(b). The applicant must then verify the identifying information and provide his or her digital or "electronic signature" affirming the accuracy of the information. *Id.* §97.057(2)(b)1.c.

The second registration option allows any applicant with a valid Florida driver's license or Florida identification card number to complete their registration online through the Florida Online Voter Registration System (FVRS).[3] *Id.* §97.0525; Fla. Admin. Code r. 1S-2.039(2)(c). The FVRS compares the applicant's driver's license or identification card with DMV records to confirm that the applicant's name and date of birth are consistent. Fla. Stat. §97.0525(4)(a). If the applicant's name and date of birth are consistent with DMV records, then the voter registration application, along with the "digital signature" of the applicant on file with the DMV, are transmitted to the county supervisor of elections. *Id.* §97.0525(4)(b). The "digital signature" is a copy of the applicant's signature submitted in person to DMV officials. *Id.* §322.142(1) (providing that the licensee shall affix his or her usual signature "in the presence of an authorized agent" of the DMV).

A third registration option is available if an applicant's name and date of birth cannot be verified against the DMV records or if the applicant has not been issued a Florida driver's license or Florida identification card (meaning the DMV does not have a copy of the applicant's signature). In such cases, the applicant can register by completing a printed application, including their original signature and the date, and delivering or mailing it to their county supervisor of elections. *Id.* §97.0525(4)(c).

---

[3] https://registertovoteflorida.gov.

Of course, any applicant can *choose* to complete and sign a printed voter registration application (and many do) and submit it to their county supervisor of elections. Printed Florida voter registration applications are widely available and can be obtained at any county supervisor of elections office, local public library, or any one of the numerous government agencies throughout the State of Florida designated by federal or state law as a voter registration agency. *See id.* §97.052(1)(b). A printable application form is also available online. Applicants may be assisted by one of the many third-party voter registration organizations, including Plaintiffs, which are actively engaged in registering voters throughout Florida with paper voter registration applications. *See id.* §97.0575.

Once a voter registration application has been submitted to the county supervisor of elections, the supervisor is responsible for verifying the eligibility of the applicant and approving, denying, or deeming an application incomplete and notifying the applicant within five business days. *Id.* §§97.052(6), 97.073. If an application is incomplete, the applicant can cure the deficiency or start the registration process again. *Id.* §97.052(6).

Plaintiffs assert that the State's narrow *original* signature requirement—required for only a very small percentage of Floridians registering to vote who do not have a digital signature that can be transmitted by the DMV—violates the materiality provision of the Civil Rights Act of 1964. Specifically, Plaintiffs claim Florida's original signature requirement violates the provision that election officials shall not "deny the right of any

6

individual to vote … because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote." 52 U.S.C. §10101(a)(2)(B). Plaintiffs have already tried their argument against Texas's original-signature requirement. The Fifth Circuit rejected it. *Vote.Org v. Callanen*, 39 F.4th 297 (5th Cir. 2022). This Court should too for at least four reasons.

First, courts have long recognized that the materiality provision "is an anti-discrimination statute designed to eliminate the discriminatory practices of registrars through arbitrary enforcement of registration requirements." *McKay v. Altobello*, No. 96-cv-3458, 1996 WL 635987, at *1 (E.D. La. Oct. 31, 1996). But Plaintiffs don't allege any discrimination. So they failed to plead an essential element of their claim.

Second, the materiality provision does not displace state law. The statute considers whether an error or omission is "material in determining whether such individual is qualified *under State law* to vote." 52 U.S.C. §10101(a)(2)(B) (emphasis added). That is, "State law" is the measure by which an error is deemed material. While the materiality provision curbs ad hoc executive actions, it does not bar ordinary application of state-law requirements.

Third, even if providing an original signature were not itself a "qualification" under state law, it is material to enabling officials to establish a voter's satisfaction of a variety of voting qualifications under Florida law. *See* Fla. Stat. §97.041. For example, an original signature helps deter and detect fraud, which gives the State assurance of the

applicant's identity and qualifications to vote. And the handwritten signature impresses the solemnity of the oath, which the Florida Constitution requires of all prospective voters.

Fourth, the materiality provision applies only to an action that "den[ies] the right of any individual to vote." 52 U.S.C. §10101(a)(2)(B). But Florida law gives all applicants the opportunity to cure any defects with their voter registration application. Fla. Stat. §§97.052(6), 97.073(1). Thus, any denial of the opportunity to vote is a direct result of an applicant's failure to cure defects, rather than a result of the signature requirement itself.

## LEGAL STANDARDS

"[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Though courts must accept a plaintiff's factual allegations as true, "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). If the complaint fails to state a plausible claim that the plaintiff is entitled to relief, the court must dismiss the complaint. *See* Fed. R. Civ. P. 12(b)(6).

## ARGUMENT

I.   **Plaintiffs must plead racial discrimination to prevail on a claim under the materiality provision.**

Congress enacted 52 U.S.C. §10101 as part of the Civil Rights Act of 1964 "under the authority of the Fifteenth Amendment to enforce that Amendment's guarantee." *United States v. Mississippi*, 380 U.S. 128, 138 (1965) (citing 42 U.S.C. §1971, recodified as 52 U.S.C. §10101). "[W]ell-settled law establishes that [§10101] was enacted pursuant to the Fifteenth Amendment for the purpose of eliminating racial discrimination in voting requirements." *Ind. Democratic Party v. Rokita*, 458 F.Supp.2d 775, 839 (S.D. Ind. 2006), *aff'd sub nom. Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008). Courts have thus held that §10101 claims "fail as a matter of law" when they "do not allege that the actions by [election] officials were racially motivated." *Broyles v. Texas*, 618 F.Supp.2d 661, 697 (S.D. Tex. 2009); *see also Ind. Democratic Party*, 458 F.Supp.2d at 839. Text and precedent support those rulings.

The plain text requires a "pattern or practice of discrimination" to show a violation of the materiality provision. *See Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1173 (11th Cir. 2008) (The text of §10101 is "the appropriate starting point of inquiry in discerning congressional intent."). The materiality provision prohibits denying someone the right to vote for errors that are not material to a voter's qualifications "under State law." 52 U.S.C. §10101(a)(2)(B). The statute says the term "qualified under State law" "*shall not*, in any event, imply qualifications more stringent

9

than those used by the persons found … to have violated subsection (a) in qualifying persons other than those of the race or color against which the pattern or practice of discrimination was found to exist." *Id.* §10101(e) (emphasis added). That is, a "pattern or practice of discrimination" is an incorporated element of all §10101 violations, including violations of the materiality provision. *Id.* And a qualification is illegitimate only if used to "qualify[] persons" of one "race or color" but disqualify persons of other races or colors. *Id.*

Statutory context further confirms that the materiality provision is aimed at racial discrimination. *See Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 466-67 (2017) (instructing courts to read text in context). Section 10101 begins by guaranteeing "[a]ll citizens" the right to vote "without distinction of race, color, or previous condition of servitude." 52 U.S.C. §10101(a). Paragraph (a)(2), which contains the materiality provision, implements that race-neutral guarantee by (A) forbidding discriminatory "standards, practices, or procedures" to determine whether voters are qualified; (B) forbidding denials of the right to vote based on immaterial errors or omissions on registration forms; and (C) restricting the use of literary tests as voter qualifications. *Id.* §10101(a)(2). The remaining sections lay out remedies, jurisdiction, and procedures. The substantive provisions provide context confirming that the statute prevents racially discriminatory state action, not neutral rules of voter registration.

Plaintiffs have not pleaded racial discrimination, so they fail to state a claim under §10101. *Broyles*, 618 F.Supp.2d at 697.

If there were any doubt that the statute requires allegations of racial discrimination, precedent resolves it. Because §10101 is an exercise of Congress's remedial powers under Fifteenth Amendment, *Mississippi*, 380 U.S. at 138, it must be congruent and proportional "to the injury to be prevented," *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997). Congress's remedial powers under the Fourteenth and Fifteenth Amendments do not give it "the power to decree the substance" of those amendments. *Id.* at 519. In considering congressional enforcement of the Fifteenth Amendment, the Supreme Court has repeatedly recognized that "action by a State that is racially neutral on its face violates the Fifteenth Amendment only if motivated by a discriminatory purpose." *City of Mobile v. Bolden*, 446 U.S. 55, 62-64 (1980) (plurality op.) (collecting cases). Fundamentally, "racially discriminatory motivation is a necessary ingredient of a Fifteenth Amendment violation." *Id.* at 62.

Since §10101 is Fifteenth Amendment legislation, *Mississippi*, 380 U.S. at 138, racial discrimination must be a "necessary ingredient" of a §10101 violation for that section to be valid. Even if another reading of §10101 were plausible—and none is— these constitutional principles counsel in favor of construing §10101 consistent with the Fifteenth Amendment's prohibition on racial discrimination. *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.").

Eleventh Circuit precedent supports this reading. In *Browning*, while the court relied on the text of §10101 as the "appropriate starting point of inquiry in discerning congressional intent" and not "the historically motivating examples of intentional and overt racial discrimination," it had no occasion to decide whether discrimination is a required element of §10101 claims. *Browning*, 522 F.3d at 1173. Nor did the court have occasion to discuss the features of the text that require a "pattern or practice of discrimination." 52 U.S.C. §10101(e). The court ruled quickly for Florida after concluding that the challenged regulations were material to voter qualifications. *Browning*'s interpretive rules, however, compel the conclusion that the text resolves this case. Even the dissent in *Browning* would not have gone as far as Plaintiffs ask this Court to go. The dissent would have found a violation of the materiality provision only because it thought the registration requirement at issue was racially discriminatory and "frustrate[d]" Congress's intent to combat "burdensome state registration requirements to disenfranchise African–Americans." *Id.* at 1181 (Barkett, J., dissenting). Because "Plaintiffs have not alleged … any discrimination based on race," their claim under the materiality provision fails. *Ind. Democratic Party*, 458 F. Supp. 2d at 839.

## II.   The materiality provision does not displace state-law requirements.

Even if the materiality provision reaches non-discriminatory executive actions, it still applies only to ad hoc executive actions. It does not bar non-arbitrary application of state laws that are duly enacted by the Legislature. The statute forbids action taken

based on an error or omission that is "not material in determining whether [an] individual is qualified under State law to vote." 52 U.S.C. §10101(a)(2)(B). That is, it asks whether the error or omission is material "under State law." *Id.* The text does not apply to errors or omissions that state law determines are material. Thus, plaintiffs proceeding under the materiality provision must allege that the defendant went beyond state law. *See, e.g., Schwier v. Cox*, 412 F. Supp. 2d 1266, 1276 (N.D. Ga. 2005) (ruling that requiring social security numbers from prospective voters "is not material in determining whether one is qualified to vote under Georgia law" because Georgia law did not require social security numbers). Plaintiffs fail to do so.

Rather, Plaintiffs' problem is with state law itself. Florida requires citizens who don't have a digital signature that can be transmitted by the DMV (meaning they are not registering to vote with the DMV or do not possess valid identification) to provide an "original signature" on their paper voter registration application. Fla. Stat. §97.053(5)(a)(8). If an applicant "fails to complete" the application by not providing an original signature, the applicant "shall not be eligible to vote in that election." Fla. Stat. §97.053(2); *see also id.* §98.045(1)(a). Plaintiffs admit that under Florida law, certain applicants "must provide" an original signature to be deemed qualified to vote. *See* Doc. 101, at ¶¶40-43. That concession ends the inquiry under the materiality provision. *See Org. for Black Struggle v. Ashcroft*, 493 F. Supp. 3d 790, 803 (W.D. Mo. 2020) (ruling that election officials "may reject applications and ballots that do not clearly indicate the

required information required by Missouri statute without offending 52 U.S.C. §10101(a)(2)(B)").

Eleventh Circuit precedent does not conflict with this application of the text. While the Eleventh Circuit has considered a facial challenge to state law under the materiality provision, the court never considered this "under state law" argument because the court found no violation of the materiality provision on other grounds. *Browning*, 522 F.3d at 1172-75. The best Plaintiffs can say of *Browning* is that the court assumed the materiality provision subjects state statutes to facial attack. But it is well established that "assumptions are not holdings." *Brown v. Electrolux Home Prod., Inc.*, 817 F.3d 1225, 1239 (11th Cir. 2016). Thus, *Browning* does not speak to whether state law determines what is material. But, as several other courts have concluded, the text of §10101(a)(2)(B) does.

Likewise, a decision from the Northern District of Georgia about a county's decision to reject absentee ballots lacking birthdates and places of birth does not support the materiality provision's application to a state-law requirement. In fact, that case, *Martin v. Crittenden*, supports Defendants' interpretation that the materiality provision does not apply to statutory requirements. There, the district court ruled that the county-established practice of rejecting absentee ballots for deficient birth information violated the materiality provision because that county-established practice was not required "under Georgia law." *Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1308-09 (N.D. Ga. 2018); *see also Jones v. Jessup*, 615 S.E.2d 529, 531 n.5 (Ga. 2005) (Under the

14

law at issue in *Martin*, a deficient birthdate on an absentee ballot was "a ground for rejection," but no state law mandated "the automatic rejection of any absentee ballot lacking the elector's place and/or date of birth."). In *Martin*, there simply was no state law reflecting the State's legislative determination that such information was material to verifying voters' identities or other qualifications to vote. Thus, as another court has correctly held, "*Martin* isn't instructive" as to the materiality provision's application to steps *required* by state law "because the court [in *Martin*] held that the county's decision was *inconsistent* with state law." *Common Cause v. Thomsen*, 574 F. Supp. 3d 634, 636 (W.D. Wis. 2021) (emphasis added) (citing *Martin*, 347 F. Supp. 3d at 1308-09). Here, by contrast, original signatures are required by "the laws, customs, or usages" of Florida, so they are material "under State law." 52 U.S.C. §10101(a)(2)(B).

## III.  The original-signature requirement is material to other voter qualifications.

Even if original signatures were not material solely by virtue of being required by state law, they are material to establishing other voter qualifications likewise required by state law.

For one, by signing the application, the applicant is "swearing or affirming under the penalty [of perjury] that the information contained in the registration application is true." Fla. Stat. §97.053(5)(a)(8). That is, the signature helps assure the State that the applicant is who she says, which "help[s] to deter and detect voter fraud." *Vote.Org*, 39 F.4th at 307. This anti-fraud rationale is the same reason the IRS requires original

signatures on physical tax returns. *See* IRS, *Details on Using E-Signatures for Certain Forms* (Dec. 8, 2021), https://perma.cc/JK4M-ZH2Y. And it's why other States similarly require original signatures on registration applications and absentee ballots. *E.g.*, Colorado. Colo. Rev. Stat. §31-10-910.3; Wash. Rev. Code §29A.40.110(3); Tex. Elec. Code §13.002.

There can be no doubt that a voter's identity and the accuracy of the application are material to determining whether a voter is qualified to vote. *See* Fla. Stat. §98.045(1) (An applicant is "ineligible" if, for example, she "is deceased," is "a fictitious person," "is not a United States Citizen," or has failed to "complete a voter registration application."). And the original signature is one element that enables the State—and perhaps even more importantly its citizens—to have confidence that its ballot box is reserved for those eligible to access it.

Plaintiffs complain that Florida law permits electronic signatures on voter registration applications for those who register at the DMV, while requiring original signatures for those registering through printed applications. But that commonplace practice doesn't defeat the value of an original signature to the State. When an applicant registers at the DMV, he is physically presenting himself to the State, in person, before an agent of the DMV, and accompanied by reams of documentation that aid the State in confirming identity and residence. *See id.* §§322.051, 322.08 (Applications for driver's licenses and identification cards must include the applicant's full name, gender, proof of social security card number, county of residence, mailing address, proof of residential

address, country of birth, proof of birth date, and proof of identity.). Further, applicants seeking a driver's license or identification card are required to affix their signature "in the presence of an authorized agent of the department to ensure that such signature becomes a part of the [license or identification] card." *Id.* §§322.051(8)(a), 322.142(1).

As mentioned, when a voter registration applicant registers online, the FVRS compares the name and date of birth of the applicant with what was already verified and recorded with the DMV. *Id.* §97.0525(4)(a). If the information matches, the online voter registration application and a copy of the signature signed "in the presence of an authorized agent of the [DMV]" are sent to the county supervisor of elections. *Id.* §97.0525(4)(b). By contrast, voter registration applicants who have not gone through the process of physically presenting themselves to the State DMV, providing proof of who they are, and affixing their signature in the presence of a DMV agent may not register using a digital signature; instead, they must affix their original signature to a paper voter registration application. *Id.* §97.0525(4)(c).

Again, common practice is instructive. While both the IRS and this Court permit electronic authentication in some circumstances, both require original signatures in others. *See* IRS, *1040*, *supra*; Local Rule 5.1(E). The law here is no different. It requires original signatures only from the small number of applicants who do not have a digital signature on file with the DMV.

Beyond identity, an applicant's original signature shows that she is "subscribing to the oath" required by the Florida Constitution. Fla. Stat. §97.053(5)(a)(8). "Physically

signing a voter registration form and thereby attesting, under penalty of perjury, that one satisfies the requirements to vote carries a solemn weight that merely submitting an electronic image of one's signature via web application does not." *Vote.Org*, 39 F.4th at 308.

Plaintiffs contend that the original signature requirement cannot be material because Florida chose to impress its solemn weight only on voters who don't have a digital signature on file that can be transmitted by the DMV. But that divorces the requirement from its context. It is perfectly reasonable for Florida to have concluded that additional solemnification measures are required for voters who have not had their identities already verified by the State or who have not affixed their signature "in the presence of an authorized agent" of the DMV. Fla. Stat. §322.051(8)(a). The reasonableness of such a determination is supported by the history and prevalence of original-signature requirements, instead of electronic authentication, in everyday life.

At bottom, Plaintiffs' claim is about technology, not materiality. "Plaintiffs do not … challenge the general requirement that an applicant must sign their application form." Doc. 101, ¶35. They also do not challenge electronic signatures. Their arguments prove too much. Under Plaintiffs' theory that "[t]he method of signing a voter registration application bears no relation to the statutory qualifications" to vote, *id.* ¶51, a State could not require *any* particular signature method. States would be forced to accept any mark made by any means: electronic and physical signatures; ink and etchings; facsimiles and photos; stamps and stickers; and signatures mailed or emailed

separate from the application. Indeed, Plaintiffs cannot explain why they think signatures themselves are material to voter qualifications, while signature methods are not. Plaintiffs' theory would leave nothing left of any signature requirement. The materiality provision does not require these absurd results. *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided….").

## IV. The original-signature requirement does not deny anyone the right to vote.

The materiality provision doesn't apply to the original-signature requirement for yet another independent reason: it doesn't "deny the right of any individual to vote." 52 U.S.C. §10101(a)(2)(B). Florida law provides applicants the opportunity to cure any defects in their voter registration applications. *See* Fla. Stat. §§97.052(6), 97.073(1). When applicants can cure defects, "it is hard to conceive how the wet signature rule deprives anyone of the right to vote." *Vote.Org*, 39 F.4th at 306. In such circumstances, it is not the State that has denied the applicant anything. Instead, it is the applicant who has given up that right by failing to cure.

At most, Plaintiffs' claims might be valid in an as-applied challenge if they could identify any voter who did not receive an opportunity to cure. But their facial challenge points to no such applicant. Indeed, Plaintiffs don't even allege that anyone has been unable to comply with the law. They say only that their members "have difficulty" signing registration applications. Doc. 101 at ¶¶21, 26-27. But the materiality provision

"does not establish a least-restrictive-alternative test" for voting. *Browning*, 522 F.3d at 1175. It prohibits denials of the right to vote, not de minimis burdens that are part and parcel of the voting process.[4]

## CONCLUSION

For the foregoing reasons, Plaintiffs' Amended Complaint should be dismissed.

---

[4] In addition to these arguments, Plaintiffs lack a private right of action to enforce the materiality provision. Intervenors recognize that this argument is foreclosed by circuit precedent. *See Schwier v. Cox*, 340 F.3d 1284, 1296 (11th Cir. 2003). But since that decision, the Supreme Court has clarified that courts should no longer "imply causes of action not explicit in the statutory text itself." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017). The Secretary persuasively explained in his initial motion to dismiss why the Eleventh Circuit should revisit that holding. *See* Doc. 91, at 30-36. Intervenors join those arguments.

Dated: June 26, 2023

Respectfully submitted,

  /s/ *Daniel E. Nordby*

Thomas R. McCarthy*
Cameron T. Norris*
Gilbert C. Dickey*
Conor D. Woodfin*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
cam@consovoymccarthy.com
gilbert@consovoymccarthy.com
conor@consovoymccarthy.com

Tyler R. Green*
CONSOVOY MCCARTHY PLLC
222 S. Main Street, 5th Floor
Salt Lake City, UT 84101
tyler@consovoymccarthy.com

*admitted *pro hac vice*

Daniel E. Nordby
Fla. Bar No. 14588
Benjamin J. Gibson
Fla. Bar No. 058661
SHUTTS & BOWEN LLP
215 South Monroe Street, Suite 804
Tallahassee, Florida 32301
Tel: (850) 241-1717
dnordby@shutts.com
bgibson@shutts.com

*Counsel for Intervenor-Defendants the Republican National Committee and the Republican Party of Pasco County*

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)**

This document contains 4,800 words, excluding what can be excluded under the

Local Rules.

*/s/ Daniel E. Nordby*

**CERTIFICATE OF SERVICE**

I e-filed this document, which will serve all parties whose counsel have entered

appearances. Those parties who have not yet appeared will be served via email.

*/s/ Daniel E. Nordby*