# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSE DIVISION

VOTE.ORG, *et al.*,

    *Plaintiffs*,

v.

CORD BYRD, in his official capacity
as SECRETARY OF STATE OF
FLORIDA, *et al.*,                                    Case No: 4:23-cv-111-AW-MAF

    *Defendants,*

    and

REPUBLICAN NATIONAL
COMMITTEE and REPUBLICAN
PARTY OF PASCO COUNTY

    *Intervenor-Defendants*.

_____/

## SECRETARY OF STATE AND UNDERSIGNED SUPERVISORS OF ELECTIONS' MOTION TO DISMISS AND INCORPORATED MEMORANDUM OF LAW

Defendants, Cord Byrd ("Secretary"), and the Supervisors of Elections for

Charlotte, Collier, Indian River, Lake, Lee, Manatee, Marion, Monroe, Pasco,

and Seminole Counties ("Undersigned Supervisors"), move to dismiss

Plaintiffs' Amended Complaint (DE 101) for lack of subject-matter jurisdiction

(under Federal Rule of Civil Procedure Rule 12(b)(1)) and failure to state a claim

(under Rule 12(b)(6)).

**INTRODUCTION**

Plaintiffs challenge Florida's requirement that those registering to vote provide an "*original signature* or a digital signature transmitted by the Department of Highway Safety and Motor Vehicles" for the purpose of "swearing or affirming," under penalty of perjury, that the information "contained in their registration application is true." § 98.053(5)(a)(8), Fla. Stat. (emphasis added). Plaintiffs claim this original signature requirement is not material for purposes of 52 U.S.C. § 10101(a)(2)(B), and that the State cannot use its omission to deny someone the right to register to vote. Plaintiffs are wrong.

Section 10101(a)(2)(B) – the Materiality Provision – provides that "deny[ing] the right of any individual to vote in any election because of an error or omission" is improper "if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." *Id.* But for the last 157 years, Florida law has required applicants to sign an oath so that voters recognize the solemnity of the act and the penalties for false attestations. Art. XIV, § 1, Fla. Const. (1868). This is a material requirement. It is also *not* burdensome because the State allows for original and digital signatures (that are copies of what the State has on file with the DMV).

Regardless, Plaintiffs lack Article III standing, statutory standing under 42 U.S.C. § 1983, and prudential third party standing. They also cannot use Section 1983 to enforce rights under the Materiality Provision. For each reason, the Court should dismiss the Amended Complaint.

## BACKGROUND

### I. Florida's Longstanding Signature Requirement.

Since at least 1868, the Florida Constitution has required citizens registering to vote to "subscrib[e]" an oath to defend the United States and Florida Constitutions. *See* Art. XIV, § 1, Fla. Const. (1868). The Florida Constitution of 1968 requires applicants to "subscribe" an oath "swear[ing] (or affirm[ing])" that they "will protect and defend the Constitution of the United States and the Constitution of the State of Florida," and that they are "qualified to register as an elector under the Constitution and laws of the State of Florida." Art. VI, § 3, Fla. Const. (1968).

The meaning of the constitutional text is clear. The word "subscribe" means "[t]o *write* (one's name) underneath; to *put* (one's signature) on a document," or "[t]o *sign* one's name to a letter or other document," "*with one's own hand*." *Subscribe*, Black's Law Dictionary (11th ed. 2019)[1] (emphasis added).

---

[1] That definition has not substantively changed since Florida first required voters to "subscribe" to an oath to register to vote. *See* https://webstersdictionary1828.com/Dictionary/subscribe (articulating the

"[W]rit[ing]," "put[ting]," or "sign[ing]" one's *own* name has significant effect. It is "an acknowledgment of" the signatory, rather than someone else, "being its writer or creator," such that the signatory "give[s] consent to," "bind[s] [him/her]self to the terms of," and "attest[s]" to the document. *Id.*

In 2002, Congress passed the Help America Vote Act ("HAVA"), which required states to develop a statewide computerized voter registration database with the name and registration information of each registered voter. 52 U.S.C. § 21083(a)(1)(A). Accordingly, in 2003, the Florida Legislature directed the Department of State to create and implement the required statewide voter registration database. *See* Ch. 2003-415, §§ 9, 10, Laws of Fla.; § 98.035(1), Fla. Stat. This database is known as the "Florida Voter Registration System" ("FVRS")*;see* R. 1S-2.039(2)(c), Fla. Admin. Code.

Similarly, in 2005, the Legislature amended the Voter Registration Act to clarify that prospective voters must provide an "original" signature on their registration applications. Ch. 2005-277, § 5, Laws of Fla. Later that year, the Legislature further amended section 97.053(5)(a)(8) to authorize applicants to register at the DMV with an electronic, or "digital," signature. Ch. 2005-278, §

---

1828 definition of "subscribe" as "**1.** To sign *with one's own hand*; to give consent to something written, or to bind one's self *by writing one's name* beneath") (emphasis added).

6, Laws of Fla. And in 2015, the Florida Legislature created the Department of State's secure, online registration portal. Ch. 2015-36, § 1, Laws of Fla.

With these changes, Floridians have two ways to register to vote. First, they may register at the DMV by filling out a voter registration application with their Florida driver license number, Florida identification number, or the last four digits of their social security number and a digital signature. § 97.057(2)(b)(1)(c), Fla. Stat.

Second, applicants with a Florida driver license number or Florida identification number may submit their voter registration application online through the Department of State's secure portal using a "digital signature of the applicant on file with the [DMV]." § 97.0525(4)(b), Fla. Stat. This "digital signature" is a copy of the applicant's original signature that he or she provided to DMV officials when applying for a Florida driver license, or other government service. In this way, the DMV authenticates the applicant's digital signature as belonging to, and affixed by, the applicant. *See* § 322.142, Fla. Stat. (requiring DMV officials to observe driver license applicants signing their license). "The online voter registration system [then] compare[s] the Florida driver license number or Florida identification number submitted" with the DMV's information "to confirm that the name and date of birth on the application are consistent" with the DMV's records. § 97.0525(4)(a), Fla. Stat.

If the information matches, then the application, along with the applicant's "digital signature," is transferred via the FVRS directly to the applicable Supervisor of Elections. *Id.* at (4)(b).

If the DMV cannot verify the applicant's information against its records, or if the applicant indicates that they do not have a Florida driver license or identification card, the applicant must sign and deliver a filled-out registration application to their Supervisor of Elections. § 97.0525(4)(c), Fla. Stat. Only under these limited circumstances would an applicant be required to affix their signature to a paper application.

## II. <u>Florida Makes It Easy to Register to Vote</u>.

A person can register to vote in Florida if he or she is at least 18 years old, a U.S. citizen, a legal Florida resident, a legal resident of the county in which he or she wants to register, and "*registers pursuant to the Florida Election Code.*" § 97.041(1)(a)1.–5, Fla. Stat. (emphasis added). In addition, individuals who have not registered to vote, have been adjudicated mentally incapacitated, or have been convicted of a felony offense (and have not had their voting rights restored) are not eligible to vote. *Id.* § 97.041(2)-(3).

Floridians registering to vote must also provide their required information in a manner authorized by Florida law. This includes subscribing to an oath before registering (art. VI, § 3, Fla. Const. (1968); § 97.051, Fla. Stat.), registering

prior to the end of the 29th day before an election (§ 97.055, Fla. Stat.), providing current and valid identification (unless exempt) if the applicant is a first-time voter in Florida and chose to register by mail (§ 97.0535, Fla. Stat.), and providing an original signature or a digital signature from the DMV (§§ 97.053(5)(a)8, 97.0525(4)(b), Fla. Stat.).

After receiving a voter registration application, Supervisors must verify the applicant's eligibility, which includes verifying that the applicant is not fictitious, notifying the applicant within five business days if his or her application is incomplete, and providing him or her an opportunity to cure the deficiency. §§ 97.052(6), 97.073(1), 98.045(1)(g), Fla. Stat. If the applicant cures the deficiency, he is registered to vote. Those who fail to cure can begin the process again, whether online, through the DMV or their Supervisor's office, or through paper applications located throughout the State.

Under these circumstances, the State's *original* signature requirement serves an important function. And this important, longstanding requirement imposes little, if any, burden on the right to vote.

## LEGAL STANDARDS

Motions to dismiss under Rule 12(b)(6) require an assessment of whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[L]egal conclusions" are not enough. *Id*. There must be enough "factual content" to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Twombly*, 550 U.S. at 555. Dismissal under Rule 12(b)(1) "can be asserted on either facial or factual grounds" with "facial challenges" being "based solely on the allegations in the complaint." *Carmichael v. Kellogg, Brown & Root Services, Inc.*, 572 F.3d 1271, 1279 (11th Cir. 2009).

## ARGUMENT

Plaintiffs cannot – and do not – plead a plausible claim under the Materiality Provision. Florida's original signature requirement serves an important function that imposes an inconsequential burden on the right to vote. The fact that Plaintiffs cannot identify a single person who has been – or will be – kept from voting because of this requirement underscores their failure to state a claim *and* their inability to establish Article III standing under any associational-standing theory. Likewise, insufficient facts make organizational standing under a diversion of resources theory implausible. Plaintiffs also lack

8

prudential third-party standing and cannot use Section 1983 to enforce rights under the Materiality Provision. Dismissal is required.

## I.    Florida's Signature Requirement Does Not Deny the Right to Vote and Is Material.

**A.** The Materiality Provision prohibits a "person acting under color of law" from "deny[ing] the right of any individual to vote in any election" due to an "error or omission on any record or paper relating to any application, registration, or other act requisite to voting," where that error or omission is immaterial to "determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B). Plaintiffs cannot show – and have not pled – sufficient facts to show that the original signature requirement denies an individual the right to vote or that the requirement is immaterial for the purposes of determining whether the individual is qualified to vote under State law.

As an initial matter, burdening or even denying a particular voter registration method does not deny an applicant's right to vote generally if other methods are available. It only represents the exclusion of one of many methods for registration. *Cf. McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 807 (1969) (finding that the right to vote was not denied, despite denying the opportunity to vote absentee, because other methods of voting were available);

*see also New Georgia Project v. Raffensperger*, 976 F.3d 1278, 1288 (11th Cir. 2020) (Lagoa, J., concurring) (noting there is no constitutional right to vote in a specific manner, such as by absentee ballot).

Even if a paper application with an original signature were the only method of registering to vote – which it is not – the Court would have to stack assumption upon assumption to find that the requirement denies the right to vote. Take, for example, the NAACP's allegations. They say that the original signature requirement "threatens to deny members of the Florida Alliance and NAACP the opportunity to vote" and burdens their ability to register to vote because "[s]ome members" "lack easy access to a printer or may otherwise have difficulty printing, signing, and returning a voter registration application." DE 101 ¶27. No member is ever identified. Plaintiffs also provide no facts about how the lack of printer access prevents members from walking into a Supervisor's office – or even a Wal-Mart – to pick up and fill out a voter registration application. *See* § 97.052(1)(b), Fla. Stat. Nor do they allege a Supervisor has ever refused to allow an applicant to cure any deficiencies. *See* § 97.073(1), Fla. Stat.

Significantly, Plaintiffs do not explain applicants are foreclosed from accessing the online voter registration application that uses the digital copy of the applicant's signature already on file with the DMV. *See* §§ 97.0525,

97.053(5)(a)8, Fla. Stat. Digital signatures already on file with the State –
verified through a name, date of birth, or social security number – work just as
well for affirming the applicant's eligibility to vote. §§ 97.0525(4)(c),
97.057(2)(b)(1)(c), 97.053(5)(a)(8), Fla. Stat. But Plaintiffs ignore how these
provisions of Florida law work together with the original signature requirement
they challenge.

**B.** Signatures are material to determining a potential voter's
qualifications. It is the signature through which the applicant subscribes to the
oath required by article VI, section 3 of the Florida Constitution and swears or
affirms that all information contained in the application – information needed
to determine the applicant's qualifications – is true. § 97.052(2)(q), Fla. Stat.
Federal law itself recognizes the materiality of signatures on voter-registration
applications. The National Voter Registration Act ("NVRA") requires that the
federal government create a mail-in voter registration form with certain
"identifying information (*including the signature of the applicant*) and other
information (including data relating to previous registration by the applicant),"
that "is necessary to enable the appropriate State election official to *assess the
eligibility of the applicant* and to administer voter registration *and other parts of the
election process*." 52 U.S.C. § 20508(b)(1) (emphasis added). The voter
registration form must also "include a statement that – (A) specifies each

11

eligibility requirement (including citizenship); (B) contains an *attestation* that the applicant meets each such requirement; and (C) *requires the signature of the applicant*, under penalty of perjury." *Id*. § 20508(b)(2) (emphasis added). States may develop their own forms provided they meet the NVRA's criteria – including the signature requirements. *Id.* § 20505(a)(2).

In sum, the NVRA prohibits states from accepting voter registration applications without an applicant's signature. That's crucial.

Under binding Eleventh Circuit precedent, the federal signature requirement makes Florida's original signature requirement per se material. In *Florida State Conference of NAACP v. Browning*, the court reviewed a challenge to Florida Statute § 97.053(6), which requires applicants registering to vote to disclose either their Florida driver license (or state-issued non-driver identification) number or the last four digits of their Social Security number, under the Materiality Provision. 522 F.3d 1153, 1174 (11th Cir. 2008). The court noted that a federal statute – the Help America Vote Act – requires states to obtain the applicant's identification numbers before accepting a registration application and to "determine whether the information provided . . . is sufficient to meet [that] requirement." *Id.* (quoting 52 U.S.C. § 21083(a)(5)(A)(iii)). That "indicates that Congress deemed the identification numbers material to determining eligibility to register and to vote." *Id.* Or as the Eleventh Circuit put

it: "because Congress required [a voter's driver license number or the last four digits of his or her Social Security number] to be on voter registration applications, they are *per se* material under § 1971(a)(2)(B)." *Id.* "Congress would [not] mandate the gathering of information . . . that it also deems immaterial." *Id.*

The same is true here. Both Florida and the NVRA's requirements demand that the applicant sign his or her registration application under penalty of perjury, both are self-authenticating, and both are material. *See* 52 U.S.C. § 20508(b)(1)-(2); § 97.053(5)(a)(8), Fla. Stat.; *see also Vote.Org v. Callanen*, 39 F.4th 297, 307 (5th Cir. 2022) ("[T]he text of Tex. Elec. Code §§ 13.002(a) and 13.002(b) suggest[s] that the general requirement that an application be 'signed by the applicant' is no more or less material under [§ 10101(a)(2)(B)] than the requirement that an application submitted by fax be 'in accordance with' the wet signature requirement," making it so "the two requirements fall or stand together under [§ 10101(a)(2)(B)]").

**C.** Plaintiffs respond that they do not "challenge the general requirement that an applicant must sign their application form" – just the requirement "that the application must bear the original, wet signature handwritten by the applicant." DE 101 ¶35. This does not change the analysis.

13

While the Materiality Provision forbids States to "disqualify a potential voter because of his or her failure to provide unnecessary information on a voting application," *Schwier v. Cox*, 340 F.3d 1284, 1297 (11th Cir. 2003), it does not prohibit States from exercising their discretion in prescribing the form used to obtain that material information. Florida has chosen its approved methods and chooses not to use Plaintiffs' preferred methods. *See* § 97.052, Fla. Stat.; *see also Browning*, 522 F.3d at 1174–75 (explaining that the Materiality Provision "refers to . . . the nature of the underlying information requested" and not "the nature of the error").

Under *Browning*, therefore, the information sought is per se material though there's no per se method for obtaining that information. *See* 522 F.3d at 1174. States may develop their own forms to gather the information, 52 U.S.C. § 20505(a)(2), which "does not alter the materiality of the information itself." 522 F.3d at 1174 n.21.

All that is left then is Plaintiffs' assumption that the original signature requirement – for those who have not already provided a signature to the DMV, which is available in digital form to other State officials – serves no purpose. They point to no facts – no person – who has actually been harmed by the original signature requirement. That underscores the problem with their pleading a claim *and* simultaneously establishes their lack of Article III standing.

## II.    Plaintiffs Lack Article III Standing and Prudential Standing.

Federal courts resolve cases or controversies. Art. III, § 2, U.S. Const. "To have a case or controversy, a litigant must establish that he has standing, which requires proof of three elements," namely "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020). When, as here, "plaintiffs seek prospective relief to prevent future injuries, they must prove that their threatened injuries are 'certainly impending.'" *Id*. Prudential standing is also required.

**A.** Because Plaintiffs are organizations, they must establish their standing in one of two ways: "(1) through [their] members (i.e., associational standing)" or "(2) through [their] own injury in fact that satisfies the traceability and redressability elements." *Ga. Ass'n of Latino Elected Offs. v. Gwinnett Cnty. Bd. of Registration and Elections*, 36 F.4th 1100, 1114 (11th Cir. 2022). *Associational standing* exists "(a) when [an organization's] members would otherwise have standing to sue in their own right, (b) the interests at stake are germane to the organization's purpose, and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Browning*, 522 F.3d at 1160

15

*Organizational standing* requires allegations of either "actual present harm" or "threat of imminent harm" to the entity itself. *City of S. Miami v. Governor of Florida*, 65 F.4th 631, 638 (11th Cir. 2023) . Such allegations typically rely on a diversion of resources theory. *Jacobson*, 974 F.3d at 1250. Under this theory, organizations must allege not only where they are diverting resources from and what they are diverting resources to, but also how the diversion differs from their usual course of conduct. *Id.* at 1250.

**B.** Plaintiff, Vote.Org, does not allege that it has members. DE 101 ¶¶11–14. So it cannot rely on associational standing. *Jacobson*, 974 F.3d at 1249 ("[F]ive of the six organizations failed to even allege, much less prove, that they have any members – voters or candidates," which is "fatal").

Plaintiffs, Florida Alliance and NAACP also attempt, but likewise fail, to establish associational standing. They claim to have "tens of thousands of members" and "12,000 members," respectively. DE 101 ¶¶15, 17. The organizations further allege that their members will be unduly burdened when they must "physically sign an application form with wet ink and submit it to an appropriate election official," find a "printer," and otherwise be exposed to "multiple points of failure or delay." DE 101 ¶¶16, 27. But the organizations never identify any member who was denied or will be denied the right to vote because of the original-signature requirement. The organizations' abstract

claims of harm to unnamed, unknown people and failure to identify any particular member who has suffered or will imminently suffer an injury is fatal to their associational standing. Binding precedent requires Plaintiffs to "make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009); *see also S. River Watershed All.*, *Inc. v. Dekalb Cnty.*, 69 F.4th 809, 820 (11th Cir. 2023) (organization sufficiently alleged associational standing "by identifying one specific member, plaintiff Echols, who has suffered a cognizable injury").

Even if they had identified a particular member, Florida Alliance and NAACP would still lack standing because they do not plausibly allege that any member faces a "'certainly impending'" harm or a "'substantial risk' of such harm." *See Tsao v. Captiva MVP Rest. Partners, LLC*, 986 F.3d 1332, 1339 (11th Cir. 2021). Plaintiffs' allegations amount to nothing more than "hypothetical harm." *Id.*. All that Plaintiffs allege is that the State's original signature requirement "threatens to deny members of Florida Alliance and NAACP the opportunity to vote" because "[s]ome members of these organizations lack easy access to a printer or may otherwise have difficulty printing, signing, and returning a voter registration application." DE 101 ¶27. But these allegations do not suggest a denial of the right to vote is "likely to occur immediately." *Browning*, 522 F.3d at 1161; *see also Corbett v. Transportation Sec. Admin.*, 930 F.3d

1225, 1233 (11th Cir. 2019) ("[The Eleventh Circuit has] held many times that a plaintiff failed to establish an injury in fact when the likelihood of future constitutional injury was too speculative.").

Plaintiff, Disability Rights Florida ("DRF"), on the other hand, alleges that it is a nonprofit "designated as Florida's federally funded Protection and Advocacy ('P&A') system for individuals with disabilities" and "constituents [that] include millions of disabled registered voters throughout the state, as well as disabled Floridians who are not yet registered to vote." DE 101 ¶23. DRF claims that it has standing to sue on behalf of its constituents because, "as Florida's designated P&A system," the Protection and Advocacy of Individual Rights Act ("PAIR"), 29 U.S.C. § 794e, authorizes it to "pursue legal, administrative, and other appropriate remedies to ensure the protection of and advocacy for the rights of individuals with disabilities." *Id.* ¶ 24.[2]

There are two problems with this claim. First, DRF's constituents are not "members" for purposes of associational standing. The Supreme Court in *Hunt v. Washington State Apple Advertising Commission* established that non-membership advocacy organizations do not have associational standing unless their "constituents" possess "indicia of membership" such that the organization "[r]epresent[s] the [constituents] and provide[s] the means by which they express

---

[2] DRF claims it has standing under 42 U.S.C. § 15043 for the same reason.

their collective views and protect their collective interests." 432 U.S. 333, 344 (1977). Specifically, the Court determined that the constituents – Washington's apple growers and dealers – possessed these indicia because "they alone elect the members of the Commission; they alone may serve on the Commission; they alone finance its activities, including the costs of this lawsuit, through assessments levied upon them." *Id.*

Applying this test, the Eleventh Circuit in *Doe v. Stincer* held that a P&A system's constituents – individuals with mental illnesses – similarly "possess[ed] the means to influence the priorities and activities the [organization] undertakes" because the statute creating the organization requires that it (1) "include individuals who have received or are receiving mental health services and family members of such individuals," (2) establish "advisory councils, sixty percent of whose membership as well as the chair of the council must be comprised of individuals who have received or are receiving mental health services," and (3) "establish a grievance procedure for clients and prospective clients to assure that individuals with mental illness have full access to the services of the system." 175 F.3d 879, 886 (11th Cir. 1999).

Here, DRF does not allege that its constituents possess any of these "indicia of membership." *See* DE 101 ¶¶23-26. Thus, it does not have associational standing to assert claims on their behalf.

Second, even if DRF alleged the required indicia, it still lacks associational standing because it does not demonstrate that its constituents "would otherwise have standing to sue in their own right." *See Hunt*, 432 U.S. at 343; *Doe*, 175 F.3d at 886 ("The right to sue on behalf of its constituents, however, does not relieve the [organization] of its obligation to satisfy *Hunt*'s first prong by showing that one of its constituents otherwise had standing."). Indeed, in *Doe*, the Eleventh Circuit determined that even though the constituents of a similar P&A system bore the "indicia of membership," the organization nonetheless lacked associational standing because it did not "show that any of its [constituents] suffered a concrete injury." 175 F.3d at 887.

DRF's allegations fail for the same reason. It claims that "some of [its] constituents are unhoused, lack stable housing, do not drive, or lack easy access to transportation." DE 101 ¶23. It neither identifies them nor alleges that any "ha[s] suffered or would suffer [imminent] harm." *Summers*, 555 U.S. at 498. For each of those reasons, it too lacks associational standing.

Plaintiffs' failure to identify a single affected person underscores the original signature requirement's obvious lack of injury. Section 97.053(5)(a)(8) provides that a voter registration application is complete if it contains "[t]he original signature or a digital signature" "under the penalty for false swearing pursuant to section 104.011 that the information contained in the registration

application is true." Section 97.0525, in turn, permits anyone with a Florida driver license number or Florida identification number to submit an online voter registration application using a "digital signature of the applicant on file with the [DMV]." The DMV also accepts registration applications with a Florida driver license number, Florida identification number, or the last four digits of the applicant's social security number and their digital signature. *Id.* § 97.057(2)(b)(1)(c). So Plaintiffs' member – to have their right to vote denied by the original signature requirement – would need to be someone without a Florida driver license number, Florida identification number, or a social security number. Plaintiffs include no allegations for such a person.

**C.** The diversion of resource-based organizational standing arguments fare no better. Vote.Org alleges that it "invested significant resources in developing an e-signature function of its web application to help voters complete their registration forms" and "would like to offer [its product] to Florida citizens, just as it has done in Alaska, Colorado, the District of Columbia, Kansas, South Carolina, and Texas." DE 101 ¶13. But those allegations are insufficient to show organizational standing. Vote.Org is simply identifying a platform it would have invested in, with or without the State's original signature requirement. Losing out on a business opportunity is not the same as an organization doing

21

something to "comba[t] the effects of the defendant's alleged conduct." *Jacobson*, 974 F.3d at 1250.

Vote.Org also does not allege where its resources are being diverted from to comply with the years-old statutory requirement. *Compare Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1350 (11th Cir. 2009) (explaining that resources would be diverted "from 'getting voters to the polls' to helping them obtain acceptable photo identification" (alteration adopted)), *with Ga. Ass'n of Latino Elected Offs.*, 36 F.4th at 1113 ("[A]n organizational plaintiff must explain where it would have to 'divert resources away *from* in order to spend additional resources on combating' the effects of the defendant's alleged conduct."). Rather, it claims that because the original signature requirement prohibits using its product, Vote.Org "must devote resources to alternative registration efforts in Florida that otherwise would be used for absentee ballot and GOTV projects in Florida and elsewhere." DE 101 ¶13. Vote.Org also notes that, "in states that require wet signatures," it "prints and mails the registrant their completed application form to sign and mail to their election official," which "requires significant resources." DE 101 ¶14. But it does not allege that it offers the latter program in Florida. *Id.*[3] Moreover, even if it did, Vote.Org does not allege that it undertakes

---

[3] In fact, beginning on July 1, 2023, Florida law will prohibit this service. Ch. 2023-120, § 4, at 9-10, Laws of Fla.

either activity to comply with the original signature requirement or "to combat[] the effects of the defendants' alleged conduct." *Ga. Ass'n of Latino Elected Offs.*, 36 F.4th at 1113.

More broadly, to the extent Vote.Org diverted any resources, the costs are part of its usual operating costs and did not "impair" its national mission. Vote.Org alleges that it "uses technology to simplify political engagement, increase voter turnout, and strengthen American democracy." DE 101 ¶11. "[I]nvest[ing] significant resources in developing an e-signature function of [a] web application to help voters complete their registration forms online" is Vote.Org's day-to-day work, *id.* ¶ 13, not a diversion of resources away from that work. An organization "cannot convert its ordinary program costs into an injury in fact." *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995).

NAACP similarly alleges that it "must divert time, money, and resources away from other activities, such as programming and initiatives concerning educational inequities, the school-to-prison pipeline, and mass incarceration" to "help[] registrants who cannot use Florida's other methods of registration to print, sign, and physically return their voter registration applications." DE 101 ¶21. Again, the organization does not "explain where it would have to divert

23

resources away *from*" "to comba[t] the effects of the defendant's alleged conduct." *Ga. Ass'n of Latino Elected Offs.*, 36 F.4th at 1113.

NAACP simply asserts that it must divert resources away from general activities, such as "programming and initiatives." DE 101 ¶21. This is not enough. In cases where the Eleventh Circuit has found standing under a diversion of resources theory, the organizational plaintiffs identified specific projects or activities they ended, or would otherwise have conducted, but for the diversion. *E.g.*, *Ga. Latino All. for Hum. Rights v. Governor of Ga.*, 691 F.3d 1250, 1260 (11th Cir. 2012) (observing that an immigration organization "cancelled citizenship classes to focus on" increased inquiries about a new law); *Browning*, 522 F.3d at 1166 (plaintiff organizations diverted "personnel and time" from "registration drives and election-day" activities to "educating" "voters on compliance with" new voting rules).

To repeat, allegations that the NAACP "works to register voters by holding registration events in coordination with local partners," including "churches and other faith-based organizations," do not establish standing either. DE 101 ¶18. This only shows that the organization invests its resources to help voters comply with Florida law – it does not establish a diversion of resources to comply with the original signature requirement. *Cf. N.A.A.C.P. v. City of Kyle, Tex.*, 626 F.3d 233, 238 (5th Cir. 2010) (dismissing case for lack of organizational

24

standing where plaintiffs "ha[d] not explained how the activities described above, which basically boil down to examining and communicating about developments in local zoning and subdivision ordinances, differ from the [plaintiff's] routine lobbying activities").

At most, NAACP alleges only some "setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). Such setbacks are not constitutionally sufficient. "But a mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient." *Sierra Club v. Morton*, 405 U.S. at 739.

Florida Alliance's and DRF's diversion of resource allegations, DE 101 ¶¶13-14 & 24-26, fail for the same reasons. Like Vote.Org and NAACP, they have not established organizational standing.

**D.** Nor do Plaintiffs establish prudential standing to challenge the Materiality Provision on behalf of third parties. The "prudential branch" of the Supreme Court's standing precedent bars federal courts from entertaining suits that seek to vindicate the constitutional rights of absent third parties. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014). The Court "adhere[s] to the rule that a party generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third

parties." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004). Plaintiffs may establish third-party standing by making "two additional showings": (1) the plaintiff "has a 'close' relationship with the person who possesses the right," and (2) "there is a 'hindrance' to the possessor's ability to protect his own interests." *Id.* at 130.

Plaintiffs' claims clearly rest on the legal rights of third parties – *i.e.*, persons eligible to vote in Florida. *See* Compl. ¶¶ 35, 38, & 42. As the Fifth Circuit concluded when reviewing Vote.Org's claim under the Materiality Provision against Texas's similar "wet signature" requirement, "an organization plainly lacks the right to vote." *Callanen*, 39 F.4th at 303. So too here; however, none of the Plaintiffs can make either of the required showings.

First, a relationship between a plaintiff and an absent third party is sufficiently close if "the former is fully, or very nearly, as effective a proponent of the right as the latter." *Powers*, 499 U.S. at 413. Exemplary relationships include doctors and patients, employers and employees, and vendors and customers. *Kowalski*, however, held that the relationship between criminal-defense attorneys and "as yet unascertained . . . criminal defendants 'who will request, but be denied, the appointment of appellate counsel, based on the operation' of the statute" was "no relationship at all." *Kowalski*, 543 U.S. at 130.

In the same way, the third parties with which Vote.Org will claim a close relationship are "as yet unascertained" Floridians who may someday decide to

26

use its digital platform to register to vote. The same goes for NAACP – it does not identify its members who have been or will be deterred from registering by the original signature requirement. And as for Florida Alliance, the Amended Complaint does not even allege that the organization attempts to help its members register. *See* DE 101 ¶¶15-16.

Courts consider a plaintiff's monetary incentives for asserting a third party's rights when determining whether that plaintiff will advocate as effectively as the third parties themselves. *See, Young Apartments, Inc. v. Town of Jupiter*, 529 F.3d 1027, 1042 (11th Cir. 2008). The Amended Complaint, however, does not allege that Vote.Org or NAACP charges any fees for the registration tools or assistance they provide. Thus, both are worse off even than the attorneys in *Kowalski*, who at least demonstrated a potential vendor-customer relationship. *Callanen*, 39 F.4th at 304 ("Vote.org's relationship with prospective users is no closer than the hypothetical attorney-client relationship rejected as insufficiently close to support third-party standing in *Kowalski*.").

Likewise, courts consider "the causal connection between the [plaintiff]'s injury and the violation of the third parties' constitutional rights." *Mata Chorwadi, Inc. v. City of Boynton Beach*, No. 20-14694, 2023 WL 3186740, at *5 (11th Cir. May 2, 2023). When a law imposes a "legal duty on the [plaintiff]" that necessarily deprives a third party of his or her constitutional rights, the

27

plaintiff may stand in the shoes of the third party. *Id.* at *4. Here, however, the original signature requirement imposes no legal duty on the Plaintiffs. Rather, it governs how voters register in Florida.

Second, nothing hinders unregistered Floridians allegedly burdened by the original signature requirement from protecting their own rights by joining this lawsuit or filing their own. *See Kowalski*, 543 U.S. at 130; *Callanen*, 39 F.4th at 304. While some of Florida Alliance and NAACP's members may not own a printer or drive a vehicle, DE 101 ¶¶16, 22, 27, surely those members are no more inhibited than the indigent prisoners in *Kowalski* – whom the Supreme Court determined could advance their own constitutional rights via *pro se* litigation. *Kowalski*, 543 U.S. at 131.

**E.** Plaintiffs also do not have standing to challenge the Materiality Provision under Section 1983. Whether a plaintiff has standing to sue under a federal statute depends on whether "using traditional tools of statutory interpretation, . . . [the court can conclude that the] legislatively conferred cause of action encompasses a particular plaintiff's claim." *Lexmark*, 572 U.S. at 127. Section 1983 "authorizes suits to enforce individual rights under the federal statutes as well as the Constitution." *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 119 (2005). But it does not "provide an avenue for relief every time a state actor violates a federal law." *Id.* And although the Supreme Court normally

deploys a generous "zone of interests" test to determine "whether [a plaintiff] falls within the class of plaintiffs whom Congress has authorized to sue" under a statute, *Lexmark*, 572 U.S. at 127-28, it has refused to apply that loose standard to Section 1983's general cause of action. *See Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. ----, No. 21-806, 2023 WL 3872515, at *9 (U.S. June 8, 2023).

Instead, "to sustain a [Section] 1983 action, the plaintiff must demonstrate that the federal statute creates an individually enforceable right *in the class of beneficiaries to which he belongs*." *Rancho Palos Verdes*, 544 U.S. at 120 (emphasis added). The Eleventh Circuit has long applied this elevated standard. *Yarbrough v. Decatur Hous. Auth.*, 931 F.3d 1322, 1325 (11th Cir. 2019) (en banc) (explaining that "[u]nder [the supremacy-of-congressional-intent] principle," positive law "give[s] rise to a private cause of action under [Section] 1983 so long as [it] 'define[s] the content of a specific right conferred upon the plaintiffs by Congress.'". And the Supreme Court recently reaffirmed its application in *Talevski*. No. 21-806, 2023 WL 3872515, at *9.

The Materiality Provision provides that "[n]o person acting under color of law shall . . . deny the right of any individual to vote in any election because of an [immaterial] error or omission on any record or paper relating to any application, registration, or other act requisite to voting . . . ." The Eleventh

29

Circuit has explained that the "focus" of that language is "the protection of each individual's right to vote." *Schwier*, 340 F.3d at 1297. Thus, the Materiality Provision's intended beneficiary class is clear – it protects actual voters. *See Id.*.

Plaintiffs, however, are advocacy organizations that do not have the right to vote. Moreover, as discussed, they do not sufficiently allege that the original signature requirement would deny any of their individual members the right to vote. Thus, without an individual or associational claim to the voting rights that they seek to enforce, Plaintiffs assert the voting rights of individuals not before the Court – *i.e.*, third-party standing. As discussed above, that argument fails on the merits.

But even if Plaintiffs had third-party standing based on the public's right to vote, "that does not mean [that they] may invoke that right" by bringing a Section 1983 suit to enforce the Materiality Provision. *Callanen*, 39 F.4th at 305 n.5. An advocacy organization's "broader . . . interest[]" in voter registration, divorced from any particularized injury, cannot satisfy the "threshold" requirement that a Section 1983 plaintiff "demonstrate that the federal statute [he seeks to enforce] creates an individually enforceable right in the class of beneficiaries to which he belongs." *Rancho Palos Verdes*, 544 U.S. at 119–20. And because Plaintiffs do not belong to the class of beneficiaries in whom the

Materiality Provision vests a right, they do not have standing to police alleged violations of the provision through a Section 1983 action.

Thus, the Court should dismiss the Amended Complaint because Plaintiffs lack third-party and statutory standing.

### III.    There Is No Cause of Action under Section 1983.

Plaintiffs also cannot use Section 1983 to enforce the Materiality Provision. To bring a Section 1983 claim challenging a violation of federal law, Plaintiffs must demonstrate that the federal statute "manifests an intent to create not just a private *right* but also a private *remedy.*" *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002). The Materiality Provision includes no such intent.

The Materiality Provision expressly authorizes the Attorney General to bring suit "for the United States, or in the name of the United States" when "any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice" that would constitute unlawful vote denial under the statute – including the Materiality Provision.52 U.S.C. § 10101(c). Public enforcement is supplemented by the limited private remedy contained in subsection (e), which provides every person of a disfavored race or color "within the affected area" the right to seek a federal-court judgment "declaring him [or her] qualified to vote" if the Attorney General prevails in an

enforcement action under subsections (a) and (c) and proves that vote denial occurred "on account of race or color" and "pursuant to a pattern or practice."

Subsection (e)'s private remedy is narrower than that available under Section 1983 in most respects, and there can be no question that it is qualitatively distinct in a way that renders Section 10101 "fundamentally incompatible" with the private remedy "offered by [Section] 1983." *Rancho Palos Verdes*, 544 U.S. at 129. The existence of such a comprehensive, specialized remedial scheme strongly suggests "Congress intended to preclude [the application of] other," more generalized remedies. *Id.* at 121. And by providing for "an express, private means of redress in the [text of the] statute itself," Congress indicated that it "did not intend to leave open a more expansive remedy under § 1983." *Id.*

Defendants acknowledge that the Eleventh Circuit in *Schwier* did conclude that Section 10101 is amenable to private enforcement via Section 1983. 340 F.3d at 1297. But if this Court concludes that it must deny this motion on account of *Schwier*, Defendants would urge it to certify the order to the Eleventh Circuit for interlocutory appeal under 28 U.S.C. § 1292(b) to repair,[4] or at least

---

[4] *Compare Schwier*, 340 F.3d at 1297, *with McKay v. Thompson*, 226 F.3d 752, 756 (6th Cir. 2000). Although the Third Circuit at one point held that "private plaintiffs have a private right of action to enforce § 10101 under 42 U.S.C. § 1983," *Migliori v. Cohen*, 36 F.4th 153, 159 (3d Cir. 2022), the Supreme Court vacated that judgment and remanded the case to be dismissed as moot pursuant to *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950). *Ritter v. Migliori*, 143 S. Ct. 297, 298 (2022). Thus, the circuit split on this issue is one-to-one.

clarify, the circuit split.[5] Section 1292(b) permits certification of an order for interlocutory review when it involves a question that can dispose of the need for litigation and there is "serious doubt as to how it should be decided." *McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251, 1257–58 (11th Cir. 2004).

Certification under Section 1292(b) requires that the (1) "order involve[] a controlling question of law"; (2) "as to which there is substantial ground for difference of opinion"; and (3) "an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). Whether Section 10101 may be enforced via Section 1983 at all, and whether – even if it may – a generic advocacy organization can enforce an individual vote-denial statute, both satisfy the requirements for 1292(b) certification.

First, issues of statutory interpretation, including whether a cause of action or remedy exists as to a particular statutory scheme or class of plaintiffs, are "controlling questions of law." *McFarlin, LLC*, 381 F.3d at 1257–58; *Love v. Delta Air Lines*, 310 F.3d 1347, 1351 (11th Cir. 2002). Second, there is substantial ground for difference of opinion where "reasonable jurists might disagree on an issue's resolution," *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 687–88, 688 n.5

---

[5] *See supra* at 28-31 (explaining that even now, *Schwier* is best understood not to allow for private enforcement by generic advocacy organizations).

(9th Cir. 2011), even when binding circuit precedent exists. *Turquitt v. Jefferson Cnty.*, 137 F.3d 1285, 1287 (11th Cir. 1998) (granting 1292(b) and then en banc review despite controlling circuit precedent).

The circuit split on whether a private plaintiff can enforce the Materiality Provision via Section 1983 suggests reasonable disagreement among jurists, *supra* n.11, and the question of whether a generic advocacy organization can do so remains a largely open question. *Callanen*, 39 F.4th at 304–05 & n.5. And finally, if the Eleventh Circuit determines that some or all of the Plaintiffs may not enforce Section 10101(a)(2)(B) via Section 1983, then certification would "substantially shorten the litigation," *McFarlin*, 381 F.3d at 1259, by making clear that those Plaintiffs cannot state a claim.

*Schwier* merits reconsideration because, in concluding that Section 10101 is enforceable via Section 1983, the panel wrongly assumed that the statute's jurisdictional grant, which provides that district courts "shall have jurisdiction of proceedings instituted pursuant to this section and shall exercise the same without regard to whether the party aggrieved shall have exhausted any administrative or other remedies that may be provided by law," 52 U.S.C. § 10101(d), "could not have applied to the Attorney General and thus was meant to remove roadblocks for the previously authorized private rights of action," 340 F.3d at 1296 (cleaned up). But that analysis misses the mark.

Section 10101(d)'s 1957 enactment provided the Attorney General a very tangible benefit – the means to enjoin state criminal proceedings that constitute vote-denial under the statute, abrogating the "familiar rule that courts of equity do not ordinarily restrain criminal prosecutions." *See Douglas v. City of Jeannette*, 319 U.S. 157, 163 (1943). Thus, when the United States asserts a valid claim under Section 10101, Section 10101(d) requires federal district courts to exercise jurisdiction and entertain the Attorney General's request to enjoin state criminal proceedings. *Id*. And even if subsection (d) did not apply to the Attorney General, it would still apply to the private plaintiffs contemplated under subsection (e). Given the statute's overall focus on expediting  Section 10101 vote-denial cases on their merits, it makes sense that Congress would exempt those private plaintiffs from any exhaustion requirement once the Attorney General has prevailed on an underlying pattern-or-practice claim.

*Schwier* also improperly relied on legislative history to divine Congress's intent. 340 F.3d at 1294–96. The ultimate "judicial task" in a Section 1983 preclusion case is "interpret[ing] the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Alexander v. Sandoval*, 532 U.S. 275, 286. On that question, "[s]tatutory intent" as observed in the plain text is "determinative." *Id.* So just as the Supreme Court in *Sandoval* concluded that it could "begin (and . . . end) [its]

search for Congress's intent with the text and structure of the statutes at issue," *id.* at 288 (cleaned up), so too could a court conclude that Section 10101's comprehensive enforcement scheme and limited private judicial remedy forecloses any indication of compatibility with private enforcement under Section 1983.

Even if *Schwier* properly considered legislative history, it relied on a 1957 House Judiciary Committee Report to suggest that Congress did not intend to foreclose private enforcement by granting the Attorney General litigation authority. 340 F.3d at 1295. But Section 10101(e) – which contains the crucial "more restrictive private remedy," *Rancho Palos Verdes*, 544 U.S. at 121 – was not added until 1960 as part of the decade-long trend towards nationwide federal enforcement that culminated in the 1965 Voting Rights Act. Pub. L. 86–449, title VI, § 601, May 6, 1960, 74 Stat. 90. II. Thus, *Schwier*'s congressional intent analysis evaluates Congress's intent in the wrong way – via subjective rather than objective evidence – and at the wrong time – 1957 rather than 1960.[6]

---

[6] Similarly, *Schwier*'s reliance on the Supreme Court's Voting Rights Act cases is inapposite. 340 F.3d at 1294. Preclusion analyses under *Rancho Palos Verdes* turn on the text of the particular statutes at issue. *See* 544 U.S. at 121–27. Although the Voting Rights Act, like Section 10101, provides for public enforcement by the Attorney General, it is not a one-for-one match for Section 10101(e)'s reticulated public/private enforcement scheme.

# CONCLUSION

For these reasons, this Court should dismiss the Amended Complaint.

Dated: June 26, 2023,                                    Respectfully submitted,

/s/ *Nicholas J.P. Meros*                                /s/ *Andy Bardos*
NICHOLAS J.P. MEROS (FBN 120270)                        ANDY BARDOS (FBN 822671)
*Deputy General Counsel*                                *Shareholder*

**EXECUTIVE OFFICE OF GOVERNOR**                        **GRAYROBINSON, P.A.**
The Capitol, PL-5                                       301 South Bronough Street, Suite 600
400 S. Monroe Street                                    Tallahassee, Florida 32302
Tallahassee, Florida 32399                              Phone: (850) 577-9090
Phone: (850) 717-9310                                   andy.bardos@gray-robinson.com
Nicholas.Meros@eog.myflorida.com

                                                        *Counsel for Supervisors Chris Anderson,*
/s/ *Joseph S. Van de Bogart*                           *Michael Bennett, Melissa Blazier, Brian*
JOSEPH S. VAN DE BOGART (FBN 84764)                     *Corley, Tommy Doyle, Joyce Griffin, Alan*
*General Counsel*                                       *Hays, Leslie Rossway Swan, Leah Valenti,*
ASHLEY E. DAVIS (FBN 48302)                             *and Wesley Wilcox.*
*Chief Deputy General Counsel*
W. DAVID CHAPPELL (FBN 120449)
*Assistant General Counsel*

**FLORIDA DEPARTMENT OF STATE**
R.A. Gray Building Suite 100
500 South Bronough Street
Tallahassee, Florida 32399
Phone: (850) 245-6536
Joseph.Vandebogart@dos.myflorida.com
Ashley.Davis@dos.myflorida.com
David.Chappell@dos.myflorida.com

*Counsel for Secretary Cord Byrd*

## REQUEST FOR ORAL ARGUMENT

Pursuant to N.D. Fla. Local Rule 7.1(K), the Secretary requests oral argument on this Motion. The Secretary estimates argument will take thirty (30) minutes per side.

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)

Pursuant to N.D. Fla. Local Rule 7.1(F), I hereby certify that this Motion complies with the Rule's font requirements and contains 7,987 words, exclusive of the case style, signature block, and any certificate of service.

*/s/ Nicholas J.P. Meros*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via the Court's CM/ECF system, which provides notice to all parties, on June 26, 2023.

*/s/ Nicholas J.P. Meros*