IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

VOTE.ORG, *et al.*

        *Plaintiffs*,

v.

CORD BYRD, in his official capacity
as Secretary of State of Florida, *et al.*

        *Defendants*.

Case No. 4:23-cv-00111-AW-MAF

**<u>STATEMENT OF INTEREST OF THE UNITED STATES</u>**

# INTRODUCTION

The United States respectfully submits this Statement of Interest pursuant to 28 U.S.C. § 517, which authorizes the Attorney General "to attend to the interests of the United States in a suit pending in a court of the United States."  This case presents important questions relating to enforcement of Section 10101 of the Civil Rights Act of 1964 (Materiality Provision), 52 U.S.C. § 10101(a)(2)(B), and the National Voter Registration Act of 1993 (NVRA), 52 U.S.C. § 20501 *et seq.*, both of which the Attorney General is authorized to enforce, 52 U.S.C. § 10101(c); 52 U.S.C. § 20510(a).

The United States submits this Statement to assist the Court's analysis of issues raised by the Intervenors' Motion to Dismiss, ECF No. 111, and Defendants' Motion to Dismiss, ECF No. 112.  First, Defendants question whether the Materiality Provision can be enforced by private plaintiffs.  But as established by binding precedent, the Materiality Provision is privately enforceable through 42 U.S.C. § 1983.  Second, Intervenors argue—in contravention of the Materiality Provision's text, and the structure and history of the Civil Rights Act—that the Materiality Provision requires showing a pattern or practice of intentional racial discrimination.  Third, Defendants posit that because a federal voter registration form that states must use under the NVRA to register qualified voters for federal elections requires a signature, Florida's original signature requirement is material

1

to establishing a voter's qualifications.  But the NVRA does not require an original signature on voter registration applications, and the statute's reference to information "necessary" to determine eligibility does not permit states to invoke eligibility verification to evade the Materiality Provision in a motion to dismiss. Fourth, Intervenors are incorrect that the Materiality Provision applies only to ad hoc executive action.  In fact, the Materiality Provision prevents states from requiring unnecessary information on voter registration applications, then using its omission to deny those applications.  Finally, Intervenors are wrong that the opportunity to cure deficient voter registration applications precludes any violation of the Materiality Provision.  This argument ignores the statute's text, and its definition of "vote," which includes registering. The United States takes no position on any other issue in this case.

## PROCEDURAL BACKGROUND

According to Plaintiffs' Amended Complaint, the State of Florida considers a voter registration application incomplete unless the application contains "[t]he original signature or a digital signature transmitted by the Department of Highway Safety and Motor Vehicles of the applicant."  Am. Compl. ¶ 37 (quoting Fla. Stat. § 97.053(5)(a)(8)), ECF No. 101.  Plaintiffs further allege that Florida permits voter registrants to use the electronic signature on file with the Florida Department of Highway Safety and Motor Vehicles (DMV) in two circumstances only:  (1)

when registering to vote through the DMV; and (2) when registering to vote using the Florida Department of State's Online Voter Registration System. *Id.* ¶¶ 38-39. But registration by paper application requires what Florida law terms an "original signature," which Plaintiffs allege has been "widely interpreted to mean a wet-ink signature." *Id.* ¶¶ 40-41 (citing Advisory Op., Fla. Dep't of State, DE 21-01 (Mar. 15, 2021)).

Plaintiffs allege that rejecting voter registration applications because they lack an original, or wet-ink, signature violates the Materiality Provision. Intervenors and several Defendants moved to dismiss for lack of standing and failure to state a claim upon which relief can be granted. Int. Mot., ECF No. 111; Def. Mot., ECF No. 112.

**STATUTORY BACKGROUND**

**A. The Materiality Provision.**

The Materiality Provision prohibits denying the right to vote "because of an error or omission" in any "application, registration, or other act requisite to voting if such error or omission is not material in determining" qualification to vote. 52 U.S.C. § 10101(a)(2)(B). The Civil Rights Act's definition of "vote" includes "all action necessary to make a vote effective including, but not limited to, registration." *Id.* § 10101(a)(3)(A), (e). The provision thus prohibits state actors from "deny[ing] the right of any individual to [register] in any election" because of

3

a paperwork error that "is not material in determining whether" the applicant "is qualified under State law to [register]."  52 U.S.C. § 10101(a)(2)(B).

The Materiality Provision was preceded by the Enforcement Act of 1870, in which the Reconstruction Congress decreed that qualified voters were eligible to vote without regard to "race, color, or previous condition of servitude," and prohibited any state laws that purported to prohibit the franchise for such impermissible reasons.  Act of May 31, 1870, ch. 114 § 1, 16 Stat. 140 (52 U.S.C. § 10101(a)(1)).  For a time, private parties brought civil enforcement actions under 42 U.S.C. § 1983 to effectuate the Enforcement Act of 1870, but the United States could enforce this law only through criminal prosecutions.  H.R. Rep. 85-291, at 1970, 1976 (1957) (1957 House Rpt.); *see*, *e.g.*, *Smith v. Allwright*, 321 U.S. 649, 650-651 & n.1 (1944); *Kellogg v. Warmouth*, 14 F. Cas. 257, 258 (C.C.D. La. 1872).  That changed when the Civil Rights Act of 1957 added four subsections to Section 10101 and granted the Attorney General enforcement authority in civil suits.  Pub. L. No. 85-315, § 601, 74 Stat. 90-92 (52 U.S.C. § 10101(e)).  Further amendment in 1960 authorized the Attorney General to bring pattern-or-practice claims for racial discrimination in voting.  Civil Rights Act of 1960, Pub. L. No. 86-449, § 601, 74 Stat. 90-92 (52 U.S.C. § 10101(e)).  Finally, Section 101 of the Civil Rights Act of 1964 again amended the statute to protect voting rights.  H.R. Rep. 88-914, 2393 (1963) (1963 House Rpt.); *see* Pub. L. No. 88-352, § 101, 78

4

Stat. 241-242.  Among these amendments was the Materiality Provision still in

force today.  *See* 52 U.S.C. § 10101(a)(2)(B).

### B. The National Voter Registration Act of 1993.

Congress passed the NVRA in part "to establish procedures that will

increase the number of eligible citizens who register to vote in elections for Federal

office."  52 U.S.C. § 20501(b)(1).  Accordingly, the NVRA requires states to

"accept and use" a uniform voter registration form (referred to as the Federal

Form) to register voters for federal elections.  *Id.* § 20505(a)(1).  The Federal Form

contains "only such identifying information *(including the signature of the*

*applicant)* and other information (including data relating to previous registration

by the applicant), as is necessary to enable the appropriate State election official to

assess the eligibility of the applicant and to administer voter registration and other

parts of the election process."  *Id.* § 20508(b)(1) (emphasis added).  The Federal

Form does not require an original signature.

### LEGAL STANDARD

In evaluating a motion to dismiss for failure to state a claim, courts must

"accept[] the factual allegations in the Complaint as true and construe[] them in the

light most favorable to the plaintiff."  *Speaker v. U.S. Dep't of Health and Human*

*Servs. Ctrs. for Disease Control and Prevention*, 623 F.3d 1371, 1379 (11th Cir.

2010).

**ARGUMENT**

Defendants and Intervenors attempt to narrow the enforceability and scope of the Materiality Provision in numerous ways, supported by neither the text nor the structure of the statute.  These attempts to rewrite the Materiality Provision should be rejected.

**A. Private plaintiffs may enforce the Materiality Provision using Section 1983.**

The Eleventh Circuit has held that private parties may enforce the Materiality Provision.  *Schwier v. Cox*, 340 F.3d 1284, 1297 (11th Cir. 2003) ("[W]e hold that the [Materiality Provision] may be enforced by a private right of action under § 1983.").  Other courts agree.  *See, e.g., Migliori v. Cohen,* 36 F.4th 153, 162 & n.56 (3d Cir. 2022), judgment vacated sub nom. *Ritter v. Migliori,* 143 S. Ct. 297 (2022);[1] *Pa. State Conf. of the NAACP v. Schmidt,* No. 1:22-CV-339,

---

[1] The Supreme Court vacated *Migliori* after the underlying dispute became moot. *See Ritter*, 143 S. Ct. at 298 (citing *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950)).  Nonetheless, the substantive analysis in *Migliori* remains convincing. *See Pa. State Conf. of the NAACP v. Schmidt,* No. 1:22-CV-339, 2023 WL 3902954, at *5 (W.D. Pa. June 8, 2023) (finding *Migliori* to be "well-reasoned and thorough" and "persuasive, particularly on the question of whether a private plaintiff may raise a [Materiality Provision] challenge through 42 U.S.C. § 1983"); *see also United States v. Ambriz*, 727 F.3d 378, 384 n.8 (5th Cir. 2013) (relying on "a case that was vacated for other reasons"); *Free Speech Coal., Inc. v. Att'y Gen. United States*, 974 F.3d 408, 427 (3d Cir. 2020) (relying on vacated opinion whose "prior analysis continues to resonate").  The only other circuit to address this issue never discussed Section 1983 in the context of the Materiality Provision, merely stating without elaboration that the Materiality Provision "is enforceable by the

2023 WL 3902954, at *5 (W.D. Pa. June 8, 2023) (holding that private parties can enforce the Materiality Provision using Section 1983).

At the outset, Defendants conflate the test for whether a federal statute contains *an implied right of action* with the issue here—whether a federal statute can be enforced via Section 1983.  Under both inquiries, courts "must first determine whether Congress *intended to create a federal right*."  *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002).  And to establish an implied right of action, plaintiffs must also show congressional intent to create "a private remedy."  *Id.* at 284 (quoting *Alexander v. Sandoval*, 532 U.S. 275, 286).  But where a statute, like the Materiality Provision, creates a federal right, that statute is presumptively enforceable under Section 1983.  *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002); *accord Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 143 S. Ct. 1444, 1457 (2023).  Defendants fail to rebut the presumption of Section 1983 enforceability because subsection (e) accompanying the Materiality Provision is not a "comprehensive enforcement scheme" that is "incompatible with individual enforcement" via Section 1983.  *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 120 (2005); *see Talevski*, 143 S. Ct. at 1459 ("The crucial consideration is

---

Attorney General, not by private citizens." *McKay v. Thompson*, 226 F.3d 752, 756 (6th Cir. 2000).  The circuit split on this issue is therefore not "one-to-one."  *See* Def. Mot. at 32 n.4.

whether Congress intended a statute's remedial scheme to be the exclusive avenue through which a plaintiff may assert his claims." (internal citations and quotation marks omitted) (alterations adopted)).  Defendants' argument thus misses the mark.

1. **Congress intended to create a federal right in enacting the Materiality Provision.**

The Materiality Provision creates a personal right to vote.  When determining whether a federal statute creates a federal right, courts consider three factors: (1) whether Congress "intended that the provision in question benefit the plaintiff"; (2) whether "the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence"; and (3) whether the statute "unambiguously impose[s] a binding obligation on the States."  *Blessing v. Freestone*, 520 U.S. 329, 340-41 (1997); *see also Bowles v. DeSantis*, 934 F.3d 1230, 1239-45 (11th Cir. 2019) (applying *Blessing* test).

The Materiality Provision meets all three factors.  First, Congress intended to create an individual right because "when Congress intends for a provision to benefit specific individuals, it will use 'rights-creating' language that is 'individually focused,' and 'phrased in terms of the persons benefited.'"  *Bowles*, 934 F.3d at 1241 (quoting *Gonzaga Univ.*, 536 U.S. at 287, 284); *accord Talevski*, 143 S. Ct. at 1446 (stating that statutes create rights when "phrased in terms of the persons benefited," with "individual-centric language" (citation and internal

quotation marks omitted)).  The Materiality Provision prohibits state actors from denying "the *right* of *any individual* to vote" on specified grounds.  52 U.S.C. § 10101(a)(2)(B) (emphases added).  The provision's language "expressly concerns" a person's right to vote—a "framing" that "is indicative of an individual 'rights-creating' focus," *Talevski*, 143 S. Ct. at 1446 (citation omitted); *see Schwier*, 340 F.3d at 1296 (determining that the Materiality Provision satisfied the first prong of the *Blessing* test because "the focus of the text" of the Provision is "the protection of each individual's right to vote."); *Schmidt,* No. 1:22-CV-339, 2023 WL 3902954, at *5 (holding that the Materiality Provision "specifically contemplates" a private plaintiff "bringing this type of claim in court." (quoting *Migliori*, 36 F.3d at 160)); *see also Democratic Party v. Hood*, 342 F. Supp. 2d 1073, 1078 (N.D. Fla. 2004) (holding that the Help America Vote Act (HAVA) "clearly evinces a congressional intention to create a federal right" because "HAVA speaks directly of individual voters, not just of actions required of elections officials, and HAVA even refers explicitly to the 'right' of voters to cast a provisional ballot.").[2]

As for the second and third *Blessing* factors, the Materiality Provision

---

[2] It does not alter the analysis that the Materiality Provision is phrased in terms of rights that state actors cannot deny, and that it makes those state actors rather than the rightsholders the grammatical subjects of the provision.  *See Talevski*, 2023 143 S. Ct. at 1458 & n.12.

"clearly provides rights which are specific and not amorphous," and "the language of the statute is mandatory rather than precatory: '*No person* acting under color of law *shall . . . deny* the right of any individual to vote . . . .'" *Schwier*, 340 F.3d at 1296-97 (quoting 52 U.S.C.§ 10101(a)(2)(B)).  The Materiality Provision satisfies all three *Blessing* factors; it thus confers an individual right.

**2. Defendants have not rebutted the presumption that the Materiality Provision is privately enforceable via Section 1983.**

"Once a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by [Section] 1983." *Gonzaga Univ.*, 536 U.S. at 284; accord *Talevski*, 143 S. Ct. at 1458-59.  That presumption is rebuttable only where a defendant shows "that Congress did not intend that remedy." *Rancho Palos Verdes*, 544 U.S. at 120.  A defendant may demonstrate congressional intent by pointing to explicit disavowal of Section 1983 enforcement, or by proving an inference of disavowal "from the statute's creation of a 'comprehensive enforcement scheme that is incompatible with individual enforcement under [Section] 1983.'" *Id.* (quoting *Blessing*, 520 U.S. at 341).  The Materiality Provision and its accompanying subsections contain neither an explicit nor an implicit intent to preclude private enforcement through Section 1983.

Defendants do not argue that the text of the Materiality Provision and its accompanying subsections explicitly deny the right to enforce it using Section 1983 (nor could they, as it clearly does not).  Instead, Defendants incorrectly

characterize subsection (e) of Section 10101 as a "limited private remedy" for violations of the Materiality Provision that implicitly bars Section 1983 enforcement.  *See* Def. Mot. at 30.  But subsection (e)'s plain text refutes that contention.  Congress added subsection (e) in 1960 to allow the Attorney General to bring pattern-or-practice suits for repeated race-based violations of subsection (a), which Congress later amended to include the Materiality Provision.  Civil Rights Act of 1960, Pub. L. No. 86-449, § 601, 74 Stat. 90-92 (now codified at 52 U.S.C. § 10101(e)); Civil Rights Act of 1964, Pub. L. No. 88-352, § 101, 78 Stat. 241-242 (now codified at 52 U.S.C. § 10101(a)(2)(B)).  Subsection (e) reads in relevant part:

> In any proceeding instituted [by the Attorney General to enforce provisions including the Materiality Provision] in the event the court finds that any person has been deprived on account of race or color of any right or privilege secured by [provisions including the Materiality Provision], the court shall upon request of the Attorney General . . . make a finding whether such deprivation was or is pursuant to a pattern or practice.  If the court finds such pattern or practice, any person of such race or color resident within the affected area shall . . . be entitled, upon his application therefor, to an order declaring him qualified to vote, upon proof that at any election or elections (1) he is qualified under State law to vote, and (2) he has since such finding by the court been (a) deprived of or denied under color of law the opportunity to register to vote or otherwise qualify to vote, or (b) found not qualified to vote by any person acting under color of law.

52 U.S.C. § 10101(e).

Subsection (e) is far from "comprehensive"—it addresses only one type of enforcement proceeding (a pattern-or-practice suit).  52 U.S.C. § 10101(e).  It

contemplates pattern-or-practice claims only where a "person has been deprived *on account of race or color* of [their rights under the Materiality Provision]," *id.* (emphasis added), leaving outside its reach all other deprivations—whether alleged in a suit brought by the Attorney General or by a private party—within the scope of the Materiality Provision.  This narrow enforcement scheme is far less comprehensive than those the Supreme Court has held precluded Section 1983 enforcement.

The Supreme Court has only thrice found that a statutory enforcement scheme was comprehensive enough to rebut the presumption of Section 1983 enforcement via "implicit preclusion." *Talevski*, 143 S. Ct. at 1460.  Each of these three cases "concerned statutes with self-contained enforcement schemes that included statute-specific rights of action" for private plaintiffs.  *Id.* at 1460-61. Allowing for Section 1983 suits would have thwarted the statutes' requirements that plaintiffs "comply with particular procedures" or "'exhaust particular administrative remedies' under the statute's enforcement scheme before suing," and "would have also 'given plaintiffs access to tangible benefits' as remedies that were 'unavailable under the statutes.'"  *Id.* (citations omitted).  Here, by contrast, a private individual is only entitled to the subsection (e) order declaring eligibility to vote after the Attorney General has brought a successful racial discrimination pattern-or-practice suit.  In other words, "the design of the enforcement scheme in"

subsection (e) is not "inconsistent with enforcement under [Section] 1983" because subsection (e)'s remedy applies only to a small subset of cases that may be brought to enforce the Materiality Provision. *Id.* at *11. Subsection (e) therefore does not rebut the presumption that the Materiality Provision is enforceable via Section 1983.

### B. A Materiality Provision violation does not require a pattern or practice of intentional racial discrimination.

The Intervenors' claim that the Materiality Provision applies only to a pattern or practice of racially discriminatory state actions is atextual and should be rejected.

### 1. Pattern-or-practice cases are a small subset of cognizable claims under the Civil Rights Act's voting guarantees.

Intervenors seek to override the plain text of subsection (e) to support their dubious contention that the Materiality Provision extends only to pattern-or-practice violations. Their approach is incorrect. The Materiality Provision is in subsection (a) of 52 U.S.C. § 10101. But Intervenors look to a definitional paragraph in subsection (e) that defines terms "when used in the subsection" only. *See* Int. Mot. at 9-10; 52 U.S.C. § 10101(e). Their attempt to graft subsection (e) into subsection (a) unravels the statute's structure and should be rejected.

Subsection (e) sets forth a process for obtaining court orders permitting individuals to vote who would otherwise be subject to an unlawful pattern or

practice, so long as the individuals are otherwise "qualified under State law."  52

U.S.C. § 10101(e).  "When used in [subsection (e)], . . . 'qualified under state law'

shall not . . . imply qualifications more stringent than those used by" state officials

"found in the proceeding to have violated subsection (a) in qualifying persons

other than those of the race or color against which the pattern or practice of

discrimination was found to exist."  *Id*.  Simply put, for these individuals seeking a

court order declaring their eligibility, "qualified under state law" excludes racially

discriminatory qualification metrics.  And this definition of "qualified under state

law" applies in subsection (e) only.  *See Id.* § 10101(a)(3)(A) (incorporating just

subsection (e)'s definition of "vote" into subsection (a)).  Nothing in the statute's

text or structure suggests that a subsection (e)-specific definition—applicable on its

face to a small subset of enforcement actions—incorporates additional elements

needed to prove a Materiality Provision violation.  And nothing whatsoever

suggests that that subsection (e)'s pattern or practice requirements can be melded

into the Materiality Provision.

## 2.  A Materiality Provision violation does not require evidence of racial discrimination.

The Materiality Provision prohibits any "person acting under color of law"

from "deny[ing] the right of any individual to vote in any election because of an"

immaterial "error or omission on any record or paper relating to any application,

registration, or other act requisite to voting."  52 U.S.C. § 10101(a)(2)(B).  The

Provision's text does not so much as mention race, much less suggest that racial discrimination is required to trigger its application.  Rather, by its plain terms, it limits state or local actions that deny anyone's right to vote based on immaterial errors or omissions.

Statutory context buttresses this plain-text reading.  A neighboring provision, 52 U.S.C. § 10101(a)(1), *does* mention race, mandating that otherwise-qualified voters are permitted to vote "without distinction of race, color, or previous condition of servitude."  Indeed, Section 10101(a)(1) already covers the waterfront of direct racial discrimination in voting and had done so for 94 years before Congress added the Materiality Provision.  *See* Act of May 31, 1870, ch. 114, 15 Stat. 140.  Because a ban on racial discrimination in voting "is already explicitly achieved by *another* portion of" the same statute, restricting the Provision to racial discrimination would render it "superfluous."  *See FCC v. NextWave Pers. Commc'ns, Inc.*, 537 U.S. 293, 307 (2003).

Intervenors rely principally—and incorrectly—on *Broyles v. Texas*, 618 F. Supp. 2d 661, 697 (S.D. Tex. 2009), *aff'd*, 381 F. App'x 370 (5th Cir. 2010).  *Broyles* suggested that a prior Fifth Circuit decision, *Kirksey v. City of Jackson*, 663 F.2d 659 (5th Cir. 1981), had "reasoned that" the Provision "is 'coterminous with the Fifteenth Amendment'" and that *Kirksey* had therefore held that it only prohibits intentional racial discrimination.  *Broyles*, 618 F. Supp. 2d at 697.  But

*Broyles* mixed up its statutes.  *Kirksey* was talking about Section 2 of the Voting

Rights Act, not the Materiality Provision of the Civil Rights Act.  *Kirksey*, 663

F.2d at 664-65.  And unlike Section 2, the Materiality Provision does not depend

on—or even mention—race or harm to racial minorities.[3]

Intervenors assert that this Court should read the Materiality Provision as

coterminous with the Fifteenth Amendment based on constitutional avoidance.  Int.

Mot. at 11.  But constitutional avoidance finds no purchase where, as here, the

proposed limiting construction is not a "plausible construction of the text."

*Johnson v. Arteaga-Martinez*, 142 S. Ct. 1827, 1833 (2022).  Moreover, no

avoidance is necessary because the Materiality Provision validly enforces the

Fifteenth Amendment without requiring evidence of racial discrimination.

The Fifteenth Amendment prohibits citizens' right to vote from being

"denied or abridged" "on account of race," and provides Congress with authority to

enforce the Amendment "by appropriate legislation."  U.S. Const. Amend. XV.

Contrary to Intervenors' contentions, Congress has wide latitude to pass legislation

---

[3] Intervenors' other cases are no more persuasive.  One erroneously relied on
Section 10101's purpose and Fifteenth-Amendment foundation, without
acknowledging that the text of the Materiality Provision is silent on race.  *Indiana
Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 839 & n.106 (S.D. Ind. 2006),
aff'd on other grounds *sub nom. Crawford v. Marion Cnty. Election Bd.*, 472 F.3d
949 (7th Cir. 2007), aff'd, 553 U.S. 181 (2008).  Another merely rejected an
attempt "to apply the statute to inner workings and negotiations of a state political
party convention."  *Thrasher v. Ill. Republican Party*, No. 4:12-cv-4071, 2013 WL
442832, at *3 (C.D. Ill. Feb. 5, 2013).

to enforce the Fifteenth Amendment, and its statutory reach is not confined to prohibitions on intentional racial discrimination. *See South Carolina v. Katzenbach*, 383 U.S. 301, 326-27 (1966). The "congruence and proportionality" standard that Intervenors cite applies only to Fourteenth Amendment legislation. *See City of Boerne v. Flores*, 521 U.S. 507, 520 (1997). Fifteenth Amendment legislation, on the other hand, remains subject only to the rationality standard articulated in *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421 (1819). *See Katzenbach*, 383 U.S. at 326-27 ("The basic test to be applied in a case involving § 2 of the Fifteenth Amendment is the same as in all cases concerning the express powers of Congress with relation to the reserved powers of the States."); *Shelby Cnty. v. Holder*, 570 U.S. 529, 556 (2013) (invalidating Voting Rights Act's coverage formula only after determining that Congress's justification was "irrational" under present conditions). Under this deferential test, "Congress may use any rational means to effectuate the constitutional prohibition of racial discrimination in voting." *Katzenbach*, 383 U.S. at 324 (1966). These means may extend beyond bans on intentional racial discrimination. *See City of Rome v. United States*, 446 U.S. 156, 177 (1980). Settled precedent forecloses Intervenors' attempt to transpose the elements of a Fifteenth Amendment violation onto the Materiality Provision.

The Materiality Provision easily passes muster under the *McCulloch*

rationality test.  And even though the *City of Boerne* test is irrelevant to the

Materiality Provision, it is clear that Congress's passage of the Materiality

Provision is congruent and proportional to the harm Congress was trying to

address.  Evidence before Congress indicated that "[a]mong the devices most

commonly employed" to prevent Black voters from registering was "applying

more rigid standards of accuracy" to Black prospective voters than to white and

rejecting Black applicants "for minor errors or omissions."  1963 House Rpt. at

2491.  Indeed, "[t]estimony show[ed] that . . . registrars" would "overlook minor

misspelling errors or mistakes in age or length of residence of white applicants,"

but deny Black applicants "for the same or more trivial reasons."  *Id.*  Congress

also had before it a 1961 Commission on Civil Rights report documenting

widespread denials of Black applicants' registration forms for immaterial errors—

such as failing to correctly compute age in years, months, and days—as well as a

list of voting rights cases brought by the Department of Justice to remedy these

discriminatory practices.[4]

---

[4] *See* Comm'n on Civil Rights, Voting: 1961 Commission on Civil Rights Report, Book 1, 54-57, 59, 66, 86 (1961), https://perma.cc/CC7B-T888; *Miscellaneous Proposals Regarding the Civil Rights of Persons Within the Jurisdiction of the United States: Hearings Before Subcomm. No. 5 of the H. Comm. on the Judiciary*, 88th Cong., 1st Sess. 951, 1099, 1380 (1963) (referencing practices in 1961 Commission Report); *Literacy Tests and Voter Requirements in Federal and State Elections: Hearings Before the Subcomm. on Const. Rights of the Comm. on the Judiciary*, 87th Cong., 2d Sess. 515-522 (1962) (Department's list of cases).

Congress properly determined that this crisis necessitated a general prohibition on denying the right to vote for immaterial errors or omissions.  That determination was especially apt, given that Congress's "previous legislative attempts" to solve this "difficult and intractable problem" through prohibitions on racial discrimination "had failed."  *Nev. Dep't of Hum. Res. v. Hibbs*, 538, U.S. 721, 737 (2003) (citation and alteration omitted) (discussing gender discrimination); *see* 1963 House Rpt. at 2393; *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1173 (11th Cir. 2008) ("Statutes enacted in 1870, 1871, 1957, and 1960 had all been unsuccessful attempts to counteract state and local government tactics of using, among other things, burdensome registration requirements to disenfranchise African-Americans.")  The Supreme Court upheld Congress's nationwide ban on literacy tests, even though the ban contained no race-discrimination requirement, because "previous legislation has proved ineffective" and because the ban "was a legitimate response to the problem." *Katzenbach*, 383 U.S. at 314, 333-34.  Here, the Materiality Provision's prohibition on facially neutral state action that denies the right to register to vote for immaterial errors or omissions is Congress's valid response to states disenfranchising their citizens.  The Materiality Provision is a legitimate exercise of Congress's power under the Fifteenth Amendment.

### C. Florida's original signature requirement differs from the NVRA's signature requirement.

Defendants argue that Florida's original signature requirement is "*per se* material" because the NVRA specifies that the Federal Form include the registrant's signature.  *See* Def. Mot. at 12.  But Defendants fail to note that the NVRA requires only "the signature of the applicant," and does not "define[] or limit[] the type of signature that is required."  *Stringer v. Hughs*, No. SA-20-CV-46, 2020 WL 6875182, at *24 (W.D. Tex. Aug. 28, 2020); *see also* 52 U.S.C. § 20508(b).  *Stringer* rejected the same argument Defendants raise here.  That court reasoned that "Defendants cite no authority for the proposition that [the NVRA requires] a physical ink or wet signature written on paper by hand." *Stringer*, 2020 WL 6875182, at *24.  Furthermore, "[w]ith twenty-first century technology and legislation such as the Global and National Commerce Act (E-Sign Act) and Uniform Electronic Transactions Act (UETA), electronic signatures are legally recognized and widely used."[5]  *Id.* (first citing 15 U.S.C. § 7001 *et seq*; then citing Unif. Electronic Transactions Act, U.L.A. (1999)).  Finally, "[i]nterpreting the signature requirement in the NVRA to include electronic signatures is consistent with the purpose of the Act and the overall statutory

---

[5] Perhaps recognizing the utility of digital signatures, Florida law allows electronic signatures on voter registration applications when submitted through the DMV or Department of State.  Fla. Stat. § 97.053(5)(a)(8); *Id.* § 97.0525(4)(a)-(b).  But for individuals without a Florida Driver's License or State ID, state law requires an original signature.  *Id.* § 97.0525(4)(c); § 97.053(5)(a)(8).

scheme," given that "[t]he NVRA established procedures to remove barriers to voter registration, to make the process easier and more convenient, and to increase voter participation." *Id.* at *25 (citing *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1335-36 (N.D. Ga. 2016) (holding that the NVRA's "records" requirement applied to both physical records and electronic records)).

Defendants' reliance on *Florida State Conference of NAACP v. Browning*, 522 F.3d 1153 (11th Cir. 2008), is misplaced.  In *Browning*, the Eleventh Circuit held that Florida's requirement that voter registrants provide a Florida driver's license number, state-issued identification number, or the last four digits of their social security number did not violate the Materiality Provision.  *Id.* at 1175.  This was because HAVA required the exact same information "'notwithstanding any other provision of law,' which of course includes the temporally prior [Materiality Provision]."  *Id.* at 1155-56, 1174 (quoting 52 U.S.C. § 21083(a)(5)(A)(i)); *see also* 52 U.S.C. § 21145(a) (omitting the Civil Rights Act of 1964 from list of laws not superseded by HAVA).  But here, the NVRA merely requires a signature for the Federal Form, with no specification as to the *type* of signature, and it does not impose requirements notwithstanding other provisions of federal law.  *See* 52 U.S.C. § 20508(b)(1).  It certainly does not require an *original* signature as a prerequisite to registration.

Defendants also suggest that the NVRA permits states to require original

signatures on applications if the requirement's purpose is to verify registrants' eligibility to vote.  *See* Def. Mot. at 14-15.  But this argument distorts the NVRA by writing in a "purpose" carveout that appears nowhere in the statute.   The NVRA states that the mail-in voter registration form "may require *only* such identifying information (including the signature of the applicant) . . . as is *necessary* to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process."  52 U.S.C. § 20508(b)(1) (emphases added).  The State's subjective *purpose* for requiring any particular information on a voter registration form is distinct from whether that information is actually *necessary* to verify a registrant's eligibility.  The NVRA therefore does not require an original signature, nor does it contain a safe harbor based on the alleged purpose of such a requirement.

As for the Materiality Provision itself, whether an original signature, as opposed to one executed in any other manner, is material to determine a registrant's eligibility to register and vote is a question of fact inappropriate for determination at the motion-to-dismiss stage.  *See Bracewell v. Nicholson Air Servs., Inc.*, 680 F.2d 103, 104 (11th Cir. 1982) ("Motions to dismiss for failure to state a claim should be denied unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim."); *Vote.org v. Ga. State Elec. Bd.*, --- F. Supp. 3d ----, 2023 WL 2432011, at *8 (N.D. Ga. March 9, 2023) ("Even if

Defendants can later prove that requiring applicants to sign in pen and ink is vital to protecting the security of the application or that the signature shows that [ ] the applicant has carefully considered his or her decision, it is improper to consider these arguments at this time because the Court's review on a motion to dismiss is limited to the pleadings.").

**D. State law cannot transform immaterial requirements into material ones.**

Intervenors also incorrectly argue that because compliance with the original signature requirement is prerequisite to registering, that requirement must be material.  Int. Mot. at 13-15.  This reading limits the Materiality Provision to "ad hoc executive actions," Int. Mot. at 12, to the exclusion of state laws, and would render the Materiality Provision a dead letter.

Intervenors cite no caselaw in which any court has ever explicitly held that the Materiality Provision applies only to "ad hoc executive actions," not to state laws.  And at least one court has explicitly rejected this reading.  *See* Order on Mot. to Dismiss at 32 n.16, *Mi Familia Vota v. Fontes*, No. CV-22-509 (D. Ariz. Feb. 16, 2023) (Ex. 1) ("[T]he text of the Materiality Provision does not indicate the Provision only concerns 'ad hoc executive actions that exceed state law.'  Nor do the cases Defendants cite for this argument support their reading of the Materiality Provision." (internal citation omitted)).

Indeed, the text of the statute reaches *all* State action.  The Materiality

Provision prevents States from "requiring unnecessary information for voter registration" and then using errors or omissions in providing that information as "an excuse to disqualify potential voters." *Schwier*, 340 F.3d at 1294. For a state law or official's action to violate the Provision, it must (1) deny the right of "any individual" to vote in an election, as defined by the statute, (2) because of an "error or omission," (3) on a "record or paper," (4) "relating to any application, registration, or other act requisite to voting," and (5) that is not "material in determining whether" that "individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B). The principal inquiry is whether the error or omission—here, providing a photocopy of a signature, or a digitally-uploaded signature, rather than a wet ink signature—is material to determining whether a voter is qualified to vote.

To answer this question, a court must identify the State's substantive voter qualifications. *See*, *e.g.*, *Migliori*, 36 F.4th at 162; *Schwier*, 340 F.3d at 1297. Then, the court must "ask[] whether, accepting the error *as true and correct*, the information contained in the error is material to determining the eligibility of the applicant." *Browning*, 522 F.3d at 1175. To state a cause of action for a violation of the Materiality Provision, errors or omissions must be "not material in determining whether [an individual] is qualified under State law" to vote. 52 U.S.C. § 10101(a)(2)(B). But this reference to "State law" addresses voters'

*substantive* qualifications which, in Florida, include age, citizenship, residency, mental incapacity, felony conviction, and (where applicable) restoration of the right to vote after a felony conviction.  Fla. Stat. § 97.041(1)-(2).  *Cf. Migliori*, 36 F.4th at 163 (explaining that a "requirement is material [under Pennsylvania law] if it goes to determining age, citizenship, residency, or current imprisonment for a felony"); *Martin*, 347 F. Supp. 3d at 1308 ("[T]he only *qualifications* for voting in Georgia are U.S. [c]itizenship, Georgia residency, being at least eighteen years of age, not having been adjudged incompetent, and not having been convicted of a felony.").

Florida law also requires that voters register prior to voting.  Fla. Stat. § 97.041(1).  But the registration requirement is not a substantive qualification that itself determines a voter's eligibility.  *See*, *e.g.*, *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 17 (2013) (distinguishing between setting qualifications and obtaining information necessary to confirm those qualifications); *Ga. State Conf. NAACP v. Georgia*, No. 1:17-cv-1397, 2017 WL 9435558, at *3 (N.D. Ga. May 4, 2017) ("[E]very legal authority the Court has located supports the conclusion that voter registration is not itself a substantive qualification to vote, but rather a procedural method which an otherwise qualified voter must follow to exercise his or her right to vote." (internal quotation marks omitted)); *Fish v. Kobach*, 840 F.3d 710, 750 (10th Cir. 2016) (rejecting argument that registration itself is a

qualification to vote).  The analysis in *Migliori* and *Martin* confirms this distinction: like Florida law, Pennsylvania and Georgia law also required registration prior to voting, but the *Migliori* and *Martin* courts did not classify the registration requirement as a substantive qualification.  *See* 25 Pa. Stat. § 1306; Ga. Code § 21-2-216.  Thus, compliance with state laws regulating voter registration— such as an original signature requirement—are not themselves voter qualifications.

Intervenors' contrary interpretation would nullify the Materiality Provision. If any procedural requirement a legislature imposes becomes a voter qualification, then errors or omissions in meeting *any* aspect of state election law automatically would be material to determining whether the voter was qualified, and no denial of the right to vote on that basis could violate the Provision.  Indeed, under Intervenors' interpretation, the Materiality Provision would not have covered the very mechanisms of vote denial that Congress passed the Provision to override. For instance, while the Louisiana Constitution allowed anyone age 21 or over to vote at the time, it also required registrants to list their age not only in years but also in days and months.  *See* 1961 Commission Rpt., *supra* note 4, at 56. Congress sought to prohibit registrars from refusing to register voters merely for incorrectly calculating the days and months of their age.  *See* p. 21 & n.5, *supra*. Yet if every requirement that States set to register or vote were deemed a "qualification," then errors in calculating the days of one's age would be material

to determining voter qualifications, and so would fall outside the Provision's reach. "That result not only would defy common sense, but also would defeat Congress' stated objective" of entirely eliminating such errors as a barrier to voters' ability to register and vote.  *See Quarles v. United States*, 139 S. Ct. 1872, 1879 (2019). "We should not lightly conclude that Congress enacted a self-defeating statute." *Id.*

### E. The opportunity to cure a deficient application does not satisfy the Materiality Provision.

Intervenors assert that the original signature requirement does not implicate the "right to vote" because applicants receive notice of any rejected registration form and a time-limited opportunity to cure the error.  Int. Mot. at 19-20.  This argument ignores the statute's text.

The Materiality Provision does not rely on a colloquial definition of the "right to vote," or on courts' definition of the phrase for constitutional purposes. The statute itself defines "the word 'vote'" broadly to "include[] all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting."  52 U.S.C. § 10101(a)(3)(A), (e).  Since Section 10101 defines "vote" to include the entire voting process, including registration, "that addition to the plain meaning controls."  *Tanzin v. Tanvir*, 141 S. Ct. 486, 490 (2020).  The Provision thus prohibits state actors from "deny[ing] the right of any individual to [*register*] in

any election" because of a paperwork error "relating to any application, registration, or other act" that "is not material in determining whether" the applicant "is qualified under State law to [register]."  52 U.S.C. § 10101(a)(2)(B) (emphasis added).

Because the original signature requirement requires rejection of applications with photocopied or digital signatures, it prevents the applicant from successfully registering to vote and therefore denies the right to vote, as defined in the Materiality Provision.  It does not matter that the State provides an opportunity to cure.  The statute "does not say that state actors may initially deny the right to vote based on errors or omissions that are not material as long as they institute cure processes." *La Unión del Pueblo Entero v. Abbott*, 604 F. Supp. 3d 512, 541 (W.D. Tex. 2022); *see Sixth Dist. of African Methodist Episcopal Church v. Kemp*, 574 F. Supp. 3d 1260, 1282 (N.D. Ga. 2021) ("Defendants have not provided any support for their argument that the opportunity to cure an error rehabilitates any potential violation of [the Materiality Provision], and the statute is silent on this point.  This argument would also require the Court to incorrectly address the merits of Plaintiffs' allegations at the motion to dismiss stage.").  Where Plaintiffs have alleged an "initial rejection" of an application "based on errors or omissions that are not material" in determining qualifications to vote, the existence of a cure process does not result in dismissal of the Complaint.  *La Unión del Pueblo*

*Entero*, 604 F. Supp. 3d at 541.

Moreover, failure to comply with registration requirements like the original signature requirement denies some voters' right to vote even under Intervenors' cramped reading. The "right of registration" is both "a prerequisite to," and inextricably intertwined with, the "right to vote." *Myers v. Anderson*, 238 U.S. 368, 376-77 (1915). This is why restrictions on *registration* have long been viewed as denying the right to *vote*. *See*, *e.g.*, *Louisiana v. United States*, 380 U.S. 145, 150, 152-53 (1965); *Lane v. Wilson*, 307 U.S. 268, 275-76 (1939). If refusal to accept a voter's application were not considered a denial of the right to vote under the Materiality Provision, the Provision's reference to errors or omissions on "any application" or "registration" would make little sense. 52 U.S.C. § 10101(a)(2)(B).

And if the ability to cure an error by submitting a second, corrected registration form could negate the Materiality Provision, then no rejection of registration materials before the close of the registration period would ever violate the Provision. Again, under this reading, even the precise practices that Congress passed the Provision to eliminate—such as refusals to register voters for incorrectly calculating their age in months and days or putting information in the wrong spot on their forms—would not trigger the statute's protections. *See* p. 21 & n.5, *supra*. This interpretation nullifies the statute and thus leaves voters

29

vulnerable to the disenfranchising practices Congress sought to eliminate.

## CONCLUSION

This Court should deny Intervenors' and Defendants' Motions to Dismiss.

July 10, 2022

                    KRISTEN CLARKE
                    Assistant Attorney General
                    Civil Rights Division


                    */s/ Holly F.B. Berlin*
                    T. CHRISTIAN HERREN, JR.
                    RICHARD DELLHEIM
                    HOLLY F.B. BERLIN
                    Attorneys, Voting Section
                    Civil Rights Division
                    U.S. Department of Justice
                    950 Pennsylvania Avenue NW
                    Washington, D.C. 20530
                    (800) 253-3931

31

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 10, 2023, I filed the foregoing via the CM/ECF system, which sends notice to counsel of record.

*/s/ Holly F.B. Berlin*
Holly F.B. Berlin
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
