## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

VOTE.ORG; FLORIDA ALLIANCE
FOR RETIRED AMERICANS;
FLORIDA STATE CONFERENCE
OF BRANCHES AND YOUTH
UNITS OF THE NAACP;
DISABILITY RIGHTS FLORIDA,

      *Plaintiffs*,

v.

CORD BYRD, in his official capacity
as Secretary of State of Florida; et al.,

      *Defendants*,
         and

REPUBLICAN NATIONAL
COMMITTEE and REPUBLICAN
PARTY OF PASCO COUNTY,

      *Intervenor-Defendants*.

Case No. 4:23-cv-111-AW-MAF

## **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' AND INTERVENORS' MOTIONS TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION ................................................................... - 1 -

LEGAL STANDARD ............................................................. - 3 -

ARGUMENT ........................................................................ - 4 -

I.   The Wet Signature Requirement violates the Materiality Provision. ............. - 4 -

   A.   The Wet Signature Requirement denies the right to vote. ....................... - 5 -

   B.   A wet signature is not material to qualifications to vote. ......................... - 7 -

   C.   Racial discrimination is not an element of a Materiality Provision claim. .... - 10 -

   D.   The Materiality Provision allows challenges to technical requirements imposed by state law ................................................................. - 13 -

II.   Plaintiffs have Article III standing. ............................................. - 15 -

   A.   DRF, Florida Alliance, and Florida NAACP have associational standing. .. - 16 -

   B.   Florida NAACP, Vote.org, and DRF have organizational standing. ...... - 20 -

III.  Plaintiffs are appropriate parties to challenge the Wet Signature Requirement under the Materiality Provision and Section 1983. ...................................... - 24 -

IV.   The Materiality Provision confers a cause of action enforceable by private plaintiffs under Section 1983, and no interlocutory appeal is warranted. ..... - 28 -

CONCLUSION ..................................................................... - 33 -

## **INTRODUCTION**

The Materiality Provision of the Civil Rights Act prohibits rejecting voter registration applications due to errors or omissions that are immaterial to determining the applicant's qualifications to vote under state law. 52 U.S.C. § 10101(a)(2)(B). Plaintiffs—four organizations dedicated to empowering and encouraging civic participation in Florida—challenge Florida's requirement that certain registration applications be rejected based on how applicants sign their forms. The qualifications to vote under Florida law are straightforward: a person is qualified if they are 18 years old by election day; a U.S. citizen; a legal resident of Florida and the county in which they wish to register; and, if they have been convicted of a felony or adjudicated mentally incapacitated with respect to voting, have had their rights restored. Fla. Stat. § 97.041. The Materiality Provision requires that Florida registers such voters, even if their registration form includes errors or omissions that are not *material* to determining whether the voter meets these specific and exclusive qualifications.

At issue is a provision of Florida law that requires any prospective voter who has not provided an electronic signature to the Department of Highway Safety and Motor Vehicles (DMV) to complete a paper registration application signed with their "original signature." Fla. Stat. § 97.053(5)(a)(8). Florida election officials—including Defendants—interpret this to mean that paper applications must be

rejected unless they include the applicant's handwritten signature in wet-ink (the "Wet Signature Requirement"). As a result, a paper application submitted with any other type of signature—e.g., an electronic or imaged signature—will be rejected and the applicant will not be registered to vote. *See id.* (providing only two options for signing an application: with wet signature or with digital signature transmitted by DMV). Plaintiffs allege that the Wet Signature Requirement violates the Materiality Provision because whether an application bears a wet ink signature is immaterial to determining a prospective voter's qualifications under Florida law.

Defendants and Intervenors moved to dismiss, *see* Sec'y of State & Supervisors' Mot. to Dismiss ("Defs.' Br."), ECF No. 112; Intervenors' Mot. to Dismiss ("Ints.' Br.") ECF No. 111, but their arguments misunderstand the Materiality Provision and the case law applying it.[1] First, they argue that the Wet Signature Requirement does not "deny" the right to vote, but under the Materiality Provision's plain terms, rejecting an application *is* denying the right to vote, even if alternate means of registering or cure opportunities are available. And regardless of other purposes it might serve, a "wet" signature on an application tells election officials nothing about whether the applicant is qualified under Florida law. Rejecting an application on this basis therefore violates the Materiality Provision.

---

[1] As used herein, "Defendants" refers to Defendant Byrd in his official capacity as the Florida Secretary of State and the ten county supervisors of elections who joined his motion to dismiss, ECF No. 112.

Furthermore, binding precedent establishes that the Materiality Provision is enforceable through private actions, and the statutory text and relevant caselaw support the ability of organizations such as Plaintiffs to challenge violations of civil rights laws, like the Materiality Provision.

Defendants' and Intervenors' standing arguments are also misplaced, particularly at this stage of the proceedings. Plaintiffs Florida State Conference of Branches and Youth Units of the NAACP (Florida NAACP), Florida Alliance for Retired Americans (FLARA), and Disability Rights Florida (DRF) sufficiently allege standing to challenge the Wet Signature Requirement on behalf of their members and constituents who have been or will be harmed by the Requirement, either through denial of applications with non-wet signatures or through deterrence from submitting an application in the first instance. Plaintiffs Vote.org, Florida NAACP, and DRF also sufficiently allege standing on their own behalf, because the Requirement forces each organization to divert resources away from other activities towards educating and assisting voters to comply with the Requirement.

The motions to dismiss must be denied.

## LEGAL STANDARD

In reviewing a Rule 12(b)(6) motion to dismiss for failure to state a claim or a facial attack on subject matter jurisdiction under Rule 12(b)(1), the Court accepts the allegations in the complaint as true and construes them in the light most favorable

to the plaintiff. *See Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1335 (11th Cir. 2012); *Lawrence v. Dunbar*, 919 F.2d 1525, 1528-29 (11th Cir. 1990). The Court must deny a motion to dismiss so long as the complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).

## ARGUMENT

The Wet Signature Requirement violates the Materiality Provision of the Civil Rights Act by denying some voters the right to vote based on how they sign their registration applications. Plaintiffs have adequately alleged that the Defendant's enforcement of the Requirement harms their members or constituents by deterring or preventing them from registering to vote and the organizations themselves by requiring diversion of resources toward educating and assisting voters to comply with the Requirement. Federal law therefore allows Plaintiffs to bring this suit under 52 U.S.C. § 10101(a)(2)(B) and 42 U.S.C. § 1983.

### I.    The Wet Signature Requirement violates the Materiality Provision.

The Materiality Provision of the Civil Rights Act provides that "[n]o person acting under color of law shall … deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any … registration … requisite to voting" if it is immaterial "in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C.

§ 10101(a)(2)(B). Florida's Wet Signature Requirement requires state election officials acting "under color of law" to deny Floridians their right to vote based on the "omission" of a handwritten, wet-ink signature on a voter registration application, which is a "record or paper" relating to "registration." Because whether a voter provides a signature by pen, e-signature, or otherwise provides no insight into a voter's qualifications to register, *see* Fla. Stat. § 97.041, rejecting applications due to the Wet Signature Requirement violates the Materiality Provision.

### A. The Wet Signature Requirement denies the right to vote.

Plaintiffs adequately allege that the Wet Signature Requirement denies the right to vote under the Materiality Provision. *First*, the Materiality Provision defines "vote" broadly, to include "all action necessary to make a vote effective including, but not limited to, registration[.]" 52 U.S.C. § 10101(a)(3)(A), (e). Rejecting the registration application of an otherwise qualified voter is a denial of the right to vote as defined by the Materiality Provision. *See id.* § 10101(a)(2)(B); *Schwier v. Cox*, 412 F. Supp. 2d 1266, 1286 (N.D. Ga. 2005) (affirming registration requirement violated Materiality Provision).

*Second*, courts repeatedly have confirmed that rejecting registrations based on errors or omissions immaterial to determining an applicant's qualifications to vote violates the Materiality Provision even where a state provides other methods of registration or an opportunity to cure. Order on Mot. to Dismiss at 32 n.17, *Mi*

*Familia Vota v. Fontes*, No. 2:22-cv-00509 (D. Ariz. Feb. 16, 2023) (Ex. 1) ("cure provision … does not warrant dismissing [] § 10101 claim"); *La Unión del Pueblo Entero v. Abbott*, 604 F. Supp. 3d 512, 542 (W.D. Tex. 2022) (holding Materiality Provision "does not only apply when a voter is absolutely prohibited from voting"); *Sixth Dist. of Afr. Methodist Episcopal Church v. Kemp*, 574 F. Supp. 3d 1260, 1282 (N.D. Ga. 2021) (rejecting argument at motion to dismiss stage that "opportunity to cure an error rehabilitates any potential violation" of Materiality Provision). These holdings are rooted in both law and logic. Under Defendants' position, a poll worker who turns away qualified voters for half the day has not actually denied anyone the right to vote because those voters can return later. This is obviously not right. When a state official rejects an individual's voter registration application, that individual is effectively denied the right to vote, regardless of other avenues that may be available for the individual to try again.

Defendants cite *McDonald v. Board of Elections Commissioners of Chicago*, 394 U.S. 802 (1969), and a concurrence in *New Georgia Project v. Raffensperger*, 976 F.3d 1278 (11th Cir. 2020), to contend that the Wet Signature Requirement is not unduly burdensome. Defs.' Br. at 9-10. But in both cases the plaintiffs alleged their claims under the Fourteenth Amendment, which—unlike Plaintiffs' claim under the Materiality Provision—requires an analysis of the burden imposed by a law under the *Anderson-Burdick* test, weighing the plaintiffs' burden against the

state's interest in the law. *See McDonald*, 394 U.S. at 806; *New Ga. Project*, 976 F.3d at 1280. Under the Materiality Provision, by contrast, the scope and magnitude of the burden are irrelevant. *See, e.g.*, *Eakin v. Adams Cnty. Bd. of Elections*, No. 1:22-cv-340, 2023 WL 3903112, at *4-5 (W.D. Pa. June 8, 2023) (employing a Materiality Provision analysis that did not involve any balancing); *Vote.org v. Ga. State Election Bd.*, No. 1:22-cv-01734, 2023 WL 2432011 (N.D. Ga. Mar. 9, 2023) (same).

### B.  A wet signature is not material to qualifications to vote.

The way an applicant signs a voter registration application does not provide insight into the applicant's qualifications to vote and is accordingly immaterial under the plain terms of the Materiality Provision. Defendants argue that a wet signature is material for two reasons, but both arguments fail.

*First*, Defendants incorrectly argue that, because "[b]oth Florida and the [National Voter Registration Act's] requirements demand that the applicant sign his or her registration application under penalty of perjury," the wet signature requirement is "*per se* material." Defs.' Br. at 12-13 (citing *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153 (11th Cir. 2008)). But this argument is rebutted by Defendants' acceptance of electronic signatures from applicants who register at the DMV or online. Defs.' Br. at 5, 10-11. If federal law required a wet signature, Defendants would be out of compliance with it for the vast majority of voter

registration forms they accept. The reality is that neither the NVRA nor *Browning* so much as mentions—much less requires—a wet signature. *See* 52 U.S.C. § 20508(b)(1); *Browning,* 522 F.3d at 1174.[2]

*Second*, Defendants' assertion that Florida can require wet signatures because the Materiality Provision "does not prohibit states from exercising their discretion in prescribing the form used to obtain [] material information," Defs.' Br. at 14, is unsupported and plain wrong. Requiring applicants to comply with needless technical requirements to present otherwise material information violates the Materiality Provision. *Diaz v. Cobb*, 435 F. Supp. 2d 1206, 1213 (S.D. Fla. 2006) (identifying "two types of non-material omissions," including "failure to follow needlessly technical instructions, such as the color of ink to use in filling out the form"). For example, age is obviously material to one's qualifications, but asking applicants "to list the exact number of months and days" for their age is the

---

[2] Defendants cite a stay order in *Vote.org v. Callanen*, 39 F.4th 297 (5th Cir. 2022), to argue that the coexistence of a signature requirement and a wet signature requirement in one statute proves that both are material. Defs.' Br. at 13. This argument fails for the reasons discussed *infra* Section I(D). Moreover, the order merely granted a stay pending appeal of the district court's decision striking down Texas's wet signature requirement under the Materiality Provision, 39 F.4th at 300, and "a motions panel decision is not binding precedent." *Northshore Dev., Inc. v. Lee*, 835 F.2d 580, 583 (5th Cir. 1988); *Democratic Exec. Comm. of Fla. v. Nat'l Republican Senatorial Comm.*, 950 F.3d 790, 795 (11th Cir. 2020) ("necessarily tentative and preliminary nature of a stay-panel opinion precludes the opinion from having an effect outside that case"). Intervenors' assertion (at 7) that the Fifth Circuit "rejected" Vote.org's Materiality Provision claim is thus significantly overstated.

quintessential "tactic" "to disqualify potential voters," and it violates the Materiality Provision. *Schwier*, 340 F.3d at 1294 (quotation marks omitted). Similarly, while Defendants purport to use signatures to *confirm* a voter's qualifications, Defs.' Br. at 5-6, the act of signing—rather than the method used—affirms the information provided is true and accurate.

Defendants rely on *Browning* to argue that Florida can employ any method it chooses to obtain material information, but *Browning* explained that the proper inquiry is whether information that is incorrect or absent from the application "is material to determining the eligibility of the applicant." *See* 522 F.3d at 1175. In this case, whether a signature is wet provides no material information at all about a voter's qualifications.

Intervenors' materiality arguments likewise fail because they assess the State's purported interests in requiring a wet signature rather than whether a wet signature is material to a voter's qualifications. Intervenors observe that applicants required to provide a wet signature "have not gone through the process of physically presenting themselves to the State DMV," Ints.' Br. at 16-17, and contend that a handwritten signature deepens the "solemnity of the oath," *id.* at 7-8. But neither physical presentment nor solemnity is a qualification for voting in Florida. Even if the State had valid reasons for preferring a wet signature in certain circumstances, the Materiality Provision prohibits rejection of voter registration applications for

reasons that are irrelevant to determining a voter's qualifications. *Cf. Schwier*, 412 F. Supp. 2d at 1276 (holding preventing "fraud" did not render mandatory disclosure of social security number "material"); *Migliori v. Cohen*, 36 F.4th 153, 163 (3d Cir. 2022), *cert. granted, judgment vacated sub nom. Ritter v. Migliori*, No. 22-30, 2022 WL 6571686 (S. Ct. Oct. 11, 2022) (mem.) (finding "whatever sort of fraud deterrence or prevention this requirement may serve, it in no way helps [the state] determine" voters' qualifications);[3] *Wash. Ass'n of Churches v. Reed*, 492 F. Supp. 2d 1264, 1270 (W.D. Wash. 2006) (rejecting argument that information used for matching purposes would help prevent fraud rendered information material).

### C. Racial discrimination is not an element of a Materiality Provision claim.

Intervenors' argument that the complaint should be dismissed because it fails to allege that the Wet Signature Requirement is the result of racial discrimination is also easily disposed of. The plain language of the Materiality Provision states that "no person acting under color of law" may disenfranchise "*any* individual" on technical grounds and makes no mention of race or discriminatory conduct. 52 U.S.C. § 10101(a)(2)(B) (emphasis added). As such, courts have recognized that it

---

[3] Although the U.S. Supreme Court vacated *Migliori* consistent with its practice in cases that become moot before a decision is issued, *see United States v. Munsingwear*, 340 U.S. 36, 39 (1950), there is nothing to suggest the Third Circuit's interpretation has changed. *See Real Alts., Inc. v. Sec'y Dep't of Health & Hum. Servs.*, 867 F.3d 338, 356 n.18 (3d Cir. 2017) (opinion vacated on non-merits grounds "sets forth the view of our Court").

"isn't limited to race discrimination[.]" *Common Cause v. Thomsen*, 574 F. Supp. 3d 634, 634 (W.D. Wis. 2021).

Neighboring provisions of the Civil Rights Act, by contrast, explicitly refer to race. *See* 52 U.S.C. § 10101(a)(1), (e). It is "generally presume[d] that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another." *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 140 S. Ct. 768, 777 (2020) (cleaned up). Because "courts must presume that a legislature says in a statute what it means," this Court cannot insert a racial-discrimination requirement into the Materiality Provision where Congress chose not to. *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992).

Intervenors quote language *outside* the Materiality Provision to claim that the "[t]he plain text requires a 'pattern or practice of discrimination' to show a violation of the materiality provision." Ints.' Br. at 9. But the quoted language describes procedures that a court must follow "[i]n any proceeding instituted pursuant to subsection (c)," 52 U.S.C. § 10101(e), and this action is not instituted pursuant to subsection (c). Furthermore, by requiring certain procedures "in the event the court finds that any person has been deprived on account of race or color of any right or privilege secured by subsection (a)," *id.*, the statute recognizes that not all claims under 52 U.S.C. § 10101(a) require a showing of racial discrimination—otherwise, the phrase "on account of race or color" would be unnecessary. *See Lowe v. Sec. &*

*Exch. Comm'n*, 472 U.S. 181, 207 n.53 (1985) ("[W]e must give effect to every word that Congress used in the statute.").

The statutory context also undermines Intervenors' claim that subsection (e) defines "qualified under State law" as used in the Materiality Provision. Subsection (e) defines "the words 'qualified under State law'" only for purposes of subsection (e). *See* 52 U.S.C. § 10101(e) (defining terms "when used in the subsection"). The same paragraph of subsection (e) defines the term "vote," but that definition is expressly incorporated into subsection (a). *See id.* § 10101(a)(3)(A) ("For purposes of this subsection … the term 'vote' shall have the same meaning as in subsection (e) of this section."). Had Congress intended subsection (e)'s definition of "qualified under State law" to apply to the Materiality Provision, it would have incorporated that term in a similar manner; it did not do so.

Intervenors also are wrong that, without a racial discrimination element, the Materiality Provision exceeds congressional power to regulate elections under the Fifteenth Amendment. Ints.' Br. at 11-12. Under the Fifteenth Amendment, "Congress may use any rational means to effectuate the constitutional prohibition of racial discrimination in voting," *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966), and the Supreme Court has "repeatedly affirmed that Congress may enact so-called prophylactic legislation that proscribes facially constitutional conduct, in order to prevent and deter unconstitutional conduct." *Tennessee v. Lane*, 541 U.S.

509, 518 (2004) (quotation marks omitted); *see also Browning*, 522 F.3d at 1173 (recognizing, with respect to Materiality Provision, "Congress in combating specific evils might choose a broader remedy"). Especially because of the history of "state and local government tactics of using … burdensome registration requirements to disenfranchise African-Americans," *Browning*, 522 F.3d at 1173, Congress can prohibit non-discriminatory deprivations of the right to vote due to immaterial omissions.

### D. The Materiality Provision allows challenges to technical requirements imposed by state law.

Intervenors attempt to muddy the plain language of the Materiality Provision again with the circular argument that the "text does not apply to errors or omissions that state law determines are material" and that Plaintiffs' "concession" that a wet signature is required by Florida law "ends the inquiry." Ints.' Br. at 13. This perverts the Materiality Provision, which asks only whether an error or omission in a record—such as a voter registration application—is "material in determining whether such individual is *qualified under State law* to vote in such election," 52 U.S.C. § 10101(a)(2)(B), not whether it is required by state law.

Intervenors' argument would effectively insulate any state law that deals with a voter's execution of registration forms, even if plainly immaterial to determining qualifications to vote. *See Ga. State Conf. NAACP v. Georgia*, No. 1:17-cv-1397, 2017 WL 9435558, at *3 (N.D. Ga. May 4, 2017) ("[E]very legal authority the Court

has located supports the conclusion that voter registration is not itself a substantive qualification to vote, but rather a procedural method which an otherwise qualified voter must follow to exercise his or her right to vote." (quotation marks omitted)). But, as courts have repeatedly found, state laws are not so insulated; whenever a citizen is denied the right to vote because of an immaterial error or omission on a record related to voting, the Materiality Provision applies. *See Browning*, 522 F.3d at 1155 (analyzing Materiality Provision challenge to "Florida statute"); *see also Reed*, 492 F. Supp. 2d at 1264 (addressing Materiality Provision challenge to state statute); *Diaz*, 435 F. Supp. 2d at 1206 (same); *Gonzalez v. Arizona*, No. 06-CV-1268, 2007 WL 9724581, at *2 (D. Ariz. Aug. 28, 2007) (same).

The cases Intervenors cite do not hold otherwise. In *Organization for Black Struggle v. Ashcroft*, the court permitted election officials to "reject applications" that did not include "information required by Missouri statute" only because it found such information material to qualifications for voting. 493 F. Supp. 3d 790 (W.D. Mo. 2020). And in *Schwier v. Cox*, 412 F. Supp. 2d 1266 (N.D. Ga. 2005), the court held that requiring applicants to provide social security numbers *violated* the Materiality Provision, even though Georgia state law required that information. Finally, in *Martin v. Crittenden*, 347 F. Supp. 3d 1302 (N.D. Ga. 2018), the court's conclusion that voters' failure to fully provide their birth year was immaterial was strengthened by the fact that state law only permitted (rather than required) rejection

- 14 -

on this basis, but the court's analysis did not rely on that fact. *See* 347 F. Supp. 3d at 1309. Instead, the court relied on the fact that "a voter's ability to correctly recite his or her year of birth on the absentee ballot envelope is not material to determining said voter's qualifications under Georgia law." *Id.* at 1308-09. Intervenors cite no case establishing that any state law requirement imposed is per se material.

## II.     Plaintiffs have Article III standing.

Plaintiffs have Article III standing because they allege injuries in fact that are fairly traceable to Defendants and redressable by this Court. *Ga. Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cnty. Bd. of Registration & Elections*, 36 F.4th 1100, 1115-16 (11th Cir. 2022). Standing requirements differ at each stage of the proceedings, and "[a]t the pleading stage 'general factual allegations of injury … may suffice,'" *Ga. Republican Party v. Sec. & Exch. Comm'n*, 888 F.3d 1198, 1201 (11th Cir. 2018) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561(1992)), if they "plausibly establish" standing, *Yelapi v. DeSantis*, 525 F. Supp. 3d 1371, 1377 (N.D. Fla. 2021) (quotation marks omitted). Plaintiffs satisfy this standard with allegations that show that DRF, Florida Alliance, and Florida NAACP each have associational standing on behalf of their members because of the substantial risk they will be deterred or prevented from registering to vote due to the Wet Signature Requirement, and that DRF, Florida NAACP, and Vote.org each have organizational standing due to their diversion of resources to address these harms. Moreover, the

Court need find that only one Plaintiff plausibly alleges associational or organizational standing to deny Defendants' motion to dismiss. *See Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 53 n.2 (2006).

### A. DRF, Florida Alliance, and Florida NAACP have associational standing.

"An organization has standing to enforce the rights of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Browning*, 522 F.3d at 1160 (quotation marks omitted). Defendants appear to challenge only the first element of standing, *see* Defs.' Br. at 16-21, but DRF, Florida Alliance, and Florida NAACP satisfy each of the three elements.

*First*, Plaintiffs' members would have standing to sue in their own right. At this stage, "the rule in this Circuit is that organizational plaintiffs need only establish that 'at least one member faces a realistic danger' of suffering an injury." *Schalamar Creek Mobile Homeowner's Ass'n, Inc. v. Adler*, 855 F. App'x 546, 552 (11th Cir. 2021) (quotation marks omitted); *see also Browning*, 522 F.3d at 1163 (finding it "highly unlikely … that not a single member w[ould] have his or her application rejected" given plaintiffs claimed around 20,000 members statewide). Defendants do not cite any Eleventh Circuit case requiring an organizational plaintiff to identify an injured member by name at the pleading stage. *See* Defs.' Br. at 16-17 (citing

*Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (finding lack of associational standing post-judgment); *S. River Watershed All., Inc. v. Dekalb Cnty.*, 69 F.4th 809, 820 (11th Cir. 2023) (first requirement of associational standing satisfied by, but not contingent on, identification of specific member); *see also Doe v. Stincer*, 175 F.3d 879, 884 (11th Cir. 1999) ("[W]e have never held that a party suing as a representative must specifically name the individual on whose behalf the suit is brought[.]").

DRF represents millions of disabled Floridians, some of whom are not yet registered to vote and lack stable housing or easy access to transportation. FAC ¶ 23. Although DRF does not have "members," "ha[ving] constituents rather than members does not deprive [an entity] of Article III standing." *Stincer*, 175 F.3d at 885 (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977)). Just like the Protection and Advocacy ("P&A") system in *Stincer* discussed in Defendants' brief (at 19), DRF's constituents "possess the means to influence the priorities and activities [DRF] undertakes," 175 F.3d at 886, because the statutes governing DRF require that it (1) include "individuals with disabilities" who are eligible or have received "services through the system" or their families; (2) "establish an advisory council … on which a majority of the members shall be … individuals with disabilities" or their families; and (3) "establish a grievance procedure for clients or prospective clients of the system to ensure that individuals

with disabilities are afforded equal opportunity to access the services of the system."
42 U.S.C. § 15044(a)(1)(B), (a)(5); 29 U.S.C. § 794e(f)(6); *see also* FAC ¶¶ 23-24.
As in *Hunt*, DRF "serves a specialized segment of the State[] … which is the primary
beneficiary of its activities, including the prosecution of this kind of litigation." 432
U.S. at 344; *see also* FAC ¶ 24 (citing 42 U.S.C. § 15043). Accordingly, DRF "may
sue on behalf of its constituents like a more traditional association may sue on behalf
of its members." *Stincer*, 175 F.3d at 886; *see also Yelapi*, 525 F. Supp. 3d at 1377
n.4 ("DRF has associational standing because its members have standing and this
case is germane to DRF's purpose.").

     Florida Alliance has tens of thousands of retired members, many of whom are
elderly, struggle with mobility and manual dexterity, and may no longer drive or
have access to a printer. FAC ¶¶ 15-16. Florida NAACP has 12,000 members across
the state. *Id.* ¶ 17. For Plaintiffs' members and constituents who are not registered
with the DMV and have difficulty obtaining, printing, signing, or returning a
registration application, the Wet Signature Requirement may deter or prevent these
individuals from registering to vote. *See id.* ¶¶ 16, 21, 27. It is beyond dispute that
denial of the right to vote satisfies Article III standing. *E.g.*, *Yick Wo v. Hopkins*, 118
U.S. 356, 370 (1886); *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).

     Defendants claim that "Plaintiffs' allegations amount to nothing more than
'hypothetical harm.'" Defs.' Br. at 17 (quoting *Tsao v. Captiva MVP Rest. Partners*,

*LLC*, 986 F.3d 1332, 1339 (11th Cir. 2021)), but acknowledge that Article III is satisfied if the harm alleged is either "certainly impending" or there is a "substantial risk of such harm," *id.*, which "does not require a plaintiff to show that it is 'literally certain that the harms they identify will come about,'" *Tsao*, 986 F.3d at 1338 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)). The cases Defendants cite involve generic speculation or failure to even allege substantial risk of injury. *Id.* at 1343-44 (finding plaintiff relied on "conclusory allegations" of identity theft that did "nothing to clarify the risks to the plaintiffs *in this case*"); *Corbett v. Transp. Sec. Admin.*, 930 F.3d 1225, 1234-35 (11th Cir. 2019) (finding plaintiff failed to allege "he represent[ed] a heightened security risk that would trigger mandatory screening under the [challenged] policy"). By contrast, Plaintiffs allege a substantial risk that at least one of their members will be deterred or prevented from registering to vote because of the Wet Signature Requirement, FAC ¶¶ 15-17, 21, 23, 27, which is sufficient to satisfy Article III at this stage. *See Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1342 (2014); *Stincer*, 175 F.3d at 884.

*Second*, the ability of Plaintiffs' members and constituents to register to vote is undeniably germane to the organizations' purposes. Federal law authorizes DRF to protect the rights of disabled Floridians, FAC ¶ 23 (citing 29 U.S.C. § 794e), and DRF receives federal funding "to ensure full participation in the electoral process for individuals with disabilities, including registering to vote," *id.* ¶ 24 (quoting 52

U.S.C. § 21061(a)). Florida Alliance's mission is to "ensure social and economic justice and full civil rights that retirees have earned after a lifetime of work." FAC ¶ 15. And Florida NAACP's mission is to "ensure the political, social, educational, and economic equality of all persons," and it has spent decades heavily engaged in a variety of statewide voter registration efforts. FAC ¶¶ 17-18; *see also Browning*, 522 F.3d at 1160 ("[T]he interests of voters in being able to register are clearly germane to [Florida NAACP's] purposes.").

*Third*, neither Plaintiffs' Materiality Provision claim nor the injunctive relief they request requires the participation of individual members in the lawsuit, and Defendants do not argue otherwise. *See* Defs.' Br. at 16-21; *see also Browning*, 522 F.3d at 1160 ("[W]hen the relief sought is injunctive, individual participation of the organization's members is not normally necessary." (quotation marks omitted)).

As a result, each of these Plaintiffs have satisfied the requirements for associational standing.

### B. Florida NAACP, Vote.org, and DRF have organizational standing.

Because at least one (in fact, three) Plaintiffs sufficiently allege associational standing to proceed with the sole claim in this case, the Court need not consider Defendants' standing arguments further. But, in addition, Florida NAACP, Vote.org and DRF each independently have standing based on direct injuries. In the Eleventh Circuit, "organizations can establish standing to challenge election laws by showing

that they will have to divert personnel and time to educating potential voters on compliance with the laws and assisting voters who might be left off the registration rolls on Election Day." *Arcia*, 772 F.3d at 1341. "[B]road allegation[s] of diversion of resources [are] enough at the pleading stage." *Ga. Ass'n of Latino Elected Offs.*, 36 F.4th at 1115. Florida NAACP, Vote.org, and DRF each allege sufficient facts to establish their right to bring this claim based on direct organizational standing.

Florida NAACP alleges that, "[b]ecause of the Wet Signature Requirement, [it] must divert valuable resources to engage in additional door-to-door canvassing activities to ensure that potential voters who cannot register online and lack easy access to printers are registered." FAC ¶ 22. These activities are "resource-intensive and require significant commitments from Florida NAACP and its members and volunteers—all resources that Florida NAACP could otherwise use to support [its] mission-critical activities," "such as programming and initiatives concerning educational inequities, the school-to-prison pipeline, and mass incarceration." *Id.* ¶¶ 21-22. Vote.org alleges that, "[b]ecause the Wet Signature Requirement prohibits the use of [the e-signature function of its web application], Vote.org must devote resources to alternative voter registration efforts in Florida that otherwise would be used for absentee ballot and GOTV projects in Florida and elsewhere." *Id.* ¶ 13.[4]

---

[4] Vote.org does not allege, as suggested by Defendants, that its investment in the e-signature function of its web application is the source of its standing. Defs.' Br. at

Despite acknowledging—indeed, quoting—Florida NAACP and Vote.org's allegations regarding these activities that are *impaired by* the Wet Signature Requirement, Defs.' Br. at 22-23, Defendants inexplicably claim that Florida NAACP and Vote.org "do[] not allege where [their] resources are being diverted from to comply with the [Wet Signature Requirement]," *id.* at 22. But the cases cited by Defendants demonstrate that, at the pleading stage, Plaintiffs' allegations are sufficient. *See Ga. Ass'n of Latino Elected Offs.*, 36 F.4th at 1115 ("general[] alleg[ations]" that organization "has diverted resources on an ongoing basis from [civic engagement, voter registration and get out the vote] activities" are "enough at the pleading stage"); *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1350 (11th Cir. 2009) (Georgia NAACP "established an injury sufficient to confer standing" by "divert[ing] resources from its regular activities to educate voters about the [challenged] requirement"); *Browning*, 522 F.3d at 1166 (finding sufficient allegations that organizations diverted "personnel and time" from unspecified "registration drives and election-day education and monitoring"); *Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1260 (11th Cir. 2012) (finding

---

21, 23. Vote.org's ability to utilize its print and mail program as part of its alternative voter registration efforts in Florida will depend on the availability and allocation of the "significant resources" it requires. *See* FAC ¶ 14. Contrary to Defendants' assertion (at 22 n.3), while Section 4 of S.B. 7050 exacerbates the difficulty of in-person registration efforts, it is inapplicable to, and thus does not prohibit, Vote.org's print and mail program.

organizational plaintiffs "satisfied … the minimum requirements of Article III" by "claim[ing] injuries analogous to those present in *Common Cause* and *Browning*"); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) ("no question" that organization's "broadly alleged" impairment of activities "constitute[d] far more than simply a setback to the organization's abstract social interests") (citing *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972)).[5]

Even putting these two Plaintiffs aside, DRF, at the very least, has organizational standing under the Eleventh Circuit's "implicit[] recogni[tion]" of a protection and advocacy system's standing to redress injuries to itself. *Stincer*, 175 F.3d at 883 (citing *Ala. Disabilities Advoc. Program v. J.S. Tarwater Developmental Ctr.*, 97 F.3d 492 (11th Cir. 1996)); *see* FAC ¶¶ 23 (DRF designated as Florida's P&A system for individuals with disabilities), 25-26 (alleging diversion of resources). Defendants make no contrary arguments, asserting only that "DRF's diversion of resource allegations … fail for the same reasons," Defs.' Br. at 25. Such a conclusory assertion is inadequate for dismissal. *See Rumsfeld*, 547 U.S. at 53 n.2 ("[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.").

---

[5] Plaintiffs' allegations are also distinguishable from *Jacobson v. Florida Secretary of State*, 974 F.3d 1236 (11th Cir. 2020), where the organizations "fail[ed] to identify *any* activities that w[ould] be impaired." *Id.* at 1250 (emphasis added). Both *Jacobson* and *NAACP v. City of Kyle*, 626 F.3d 233 (5th Cir. 2010), moreover, assessed organizational standing post-trial, not on motions to dismiss.

### III. Plaintiffs are appropriate parties to challenge the Wet Signature Requirement under the Materiality Provision and Section 1983.

Defendants argue that Plaintiffs are not the proper parties to challenge the Wet Signature Requirement under the Materiality Provision or Section 1983, but this argument, too, is without merit. The plain terms of the Materiality Provision evidence congressional intent to broadly confer standing on all aggrieved parties, including those suffering associational and organizational injuries. The Materiality Provision's protection of the right to vote is also presumptively enforceable under Section 1983, and neither its statutory text nor relevant caselaw support limiting such enforcement to only individual voters. To the extent prudential considerations apply, Plaintiffs also are qualified to represent third-party voters injured by the Wet Signature Requirement.

*First*, the text of Section 101 of the Civil Rights Act contemplates a cause of action for Plaintiffs' organizational injuries. Subsection (d) expressly recognizes that federal district courts have jurisdiction over actions to enforce the law "without regard to whether the party aggrieved shall have exhausted any administrative or other remedies that may be provided by law." 52 U.S.C. § 10101(d). Use of the term "aggrieved person" or "party aggrieved" indicates "a congressional intention to define standing as broadly as is permitted by Article III of the Constitution." *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972); *see also Fed. Election Comm'n v. Akins*, 524 U.S. 11, 19 (1998) ("History associates the word 'aggrieved'

- 24 -

with a congressional intent to cast the standing net broadly—beyond the common-law interests and substantive statutory rights upon which 'prudential' standing traditionally rested."). Congress could have granted jurisdiction to any "individuals seeking to vote," but instead chose a term that permits enforcement by the broadest array of plaintiffs.

*Second*, Plaintiffs also have statutory standing under Section 1983, which provides a remedy against state actors who cause "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. The Materiality Provision's "focus … is … the protection of each individual's right to vote," *Schwier*, 340 F.3d at 1296-97, and "[o]nce a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983," *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002). Section 1983's statutory text provides only that liability or relief must flow from the state actors sued to the "party injured." 42 U.S.C. § 1983. It does not foreclose suits by parties with associational and organizational injuries like Plaintiffs to enforce the rights of individual voters.

Defendants claim that the Eleventh Circuit "has long applied [an] elevated standard" that requires Section 1983 plaintiffs to demonstrate that the federal statute "define[s] the content of a specific right conferred upon the plaintiffs by Congress." Defs.' Br. at 29 (quoting *Yarbrough v. Decatur Hous. Auth.*, 931 F.3d 1322, 1325 (11th Cir. 2019) (en banc)). But the *Yarbrough* court was considering whether

regulations can join with a statute to create an enforceable right and did not discuss or apply this standard in the context of organizational plaintiffs. Defendants' attempt to restrict the class of permissible Section 1983 plaintiffs to individual rights-holders conflicts with long-standing precedent from the Supreme Court and other courts around the country. *See, e.g.*, *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392-93 (1988) (holding "litigants are permitted to challenge a statute [under § 1983] not because their own rights of free expression are violated," but to protect the rights of "others not before the court") (cleaned up); *Ezell v. City of Chicago*, 651 F.3d 684, 696 (7th Cir. 2011) (holding firing range supplier could bring § 1983 claim asserting the Second Amendment rights of its potential customers); *Coggins v. Carpenter*, 468 F. Supp. 270, 282 (E.D. Pa. 1979) (holding plaintiffs need not be "the object of the conduct allegedly in violation of 42 U.S.C. § 1983" to assert a claim).

The Materiality Provision and Section 1983 encompass Plaintiffs' claim, and courts "cannot limit a cause of action that Congress has created merely because 'prudence' dictates." *Lexmark Int'l, Inc. v. Static Control Components*, 572 U.S. 118, 128 (2014). But even if Plaintiffs could only maintain this suit on behalf of individuals denied the right to vote by the Wet Signature Requirement, Plaintiffs are qualified to do so on multiple grounds. First, DRF is federally authorized to "pursue legal, administrative, and other appropriate remedies" "to ensure full participation

in the electoral process for individuals with disabilities [in Florida], including registering to vote." 42 U.S.C. § 15043(a)(2)(A)(i); 52 U.S.C. § 21061(a). Additionally, DRF, Florida Alliance, and Florida NAACP each have associational standing on behalf of their members who may be prevented from registering to vote due to the Wet Signature Requirement. *Supra* Section II(A). Finally, Plaintiffs satisfy the test for third-party standing. *See Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (requiring that party seeking third-party standing demonstrate "'close relationship with the person who possesses the right" and "hindrance to the possessor's ability to protect his own interests") (quotation marks omitted).

Each Plaintiff has a "close relationship" with its users, constituents, and members. Defendants concede that a vendor/vendee relationship is exemplary of this dynamic, Defs.' Br. at 26, and "vendors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function," *Craig v. Boren*, 429 U.S. 190, 195 (1976). Vote.org is "in like position[]" to a vendor deprived of making its "function,"—the e-signature function of its web application—available to its users, depriving those users of the right to vote, which is a "causal connection between the [plaintiff]'s injury and the violation of the third parties' constitutional rights." Defs.' Br. at 27 (quoting *Mata Chorwadi, Inc. v. City of Boynton Beach*, No. 20-14694, 2023 WL 3186740, at *5 (11th Cir. May 2, 2023)).

- 27 -

And Vote.org's users are hardly "as yet unascertained," Defs.' Br.at 26—it has helped register over 390,000 Florida voters since 2016. FAC ¶ 11. Similarly, Florida NAACP has 12,000 members who, like the tens of thousands of members of Florida Alliance, have chosen to voluntarily formalize their relationship with the organization. Finally, federal law specifically designates DRF to be "a proponent of the right[s]" of the disabled community in Florida, *Powers v. Ohio*, 499 U.S. 400, 413 (1991); 52 U.S.C. § 21061(a).

Plaintiffs' users, constituents, and members also face a "hindrance" in protecting their interests, *Kowalski*, 543 U.S. at 130, given the "small financial stake involved and the economic burdens of litigation," *Powers*, 499 U.S. at 415. And the claim that Plaintiffs' members "are no more inhibited than the indigent prisoners in *Kowalski*," Defs.' Br. at 28, ignores that those prisoners were *already* engaged in litigating their appeals. Plaintiffs' non-registered members and constituents, by contrast, face at least "some hinderance" to protecting their right to register and vote. *Powers*, 499 U.S. at 411; *see* FAC ¶¶ 11, 16-17, 23.

### IV.   The Materiality Provision confers a cause of action enforceable by private plaintiffs under Section 1983, and no interlocutory appeal is warranted.

Binding precedent—including from the Eleventh Circuit and U.S. Supreme Court—requires rejection of Defendants' argument that the Materiality Provision is not enforceable by a private right of action. "By its terms, § 1983 is available to

enforce every right that Congress validly and unambiguously creates." *Health &*
*Hosp. Corp. of Marion Cnty. v. Talevski*, 143 S. Ct. 1444, 1462 (2023); *see also*
*Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 700-01 (1978)
(Section 1983 "provide[s] a remedy, to be broadly construed, against all forms of
official violation of federally protected rights"). The Materiality Provision's
unambiguous protection of the right to vote makes it presumptively enforceable
under Section 1983. *See Schwier*, 340 F.3d at 1296-97; *Gonzaga Univ.*, 536 U.S. at
283-84.

To defeat the presumption of Section 1983 enforcement, Defendants must
"demonstrat[e] that Congress did not intend that remedy," which, if not stated
"directly in the statute," must be "inferred from the statute's creation of a
comprehensive enforcement scheme that is incompatible with individual
enforcement under § 1983." *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113,
120 (2005) (quotation marks omitted). "The crucial consideration is whether
Congress intended a statute's remedial scheme to be *the exclusive avenue* through
which a plaintiff may assert [his] claims," which requires "*incompatibility* between
enforcement under § 1983 and the enforcement scheme that Congress has
enacted." *Talevski*, 143 S. Ct. at 1459 (cleaned up). The Supreme Court has found
such "implicit preclusion" in only three cases, each of which "concerned statutes
with self-contained enforcement schemes that included statute-specific rights of

action." *Id.* at 1460-61 (collecting cases). The Materiality Provision contains nothing of the sort.

In an attempt to satisfy their burden to show that "the design of the enforcement scheme in the [Materiality Provision] is inconsistent with enforcement under §1983," *id.* at 1459 (quoting *Abrams*, 544 U. S. at 120), Defendants point to "the limited private remedy contained in subsection (e)." Defs.' Br. at 31-32. But subsection (e) provides no private right of action; instead it refers to proceedings initiated by the Attorney General where, "upon request of the Attorney General," the court finds a "pattern or practice" of vote denial "on account of race or color," allowing affected members of the targeted racial group to "appl[y]" for an "order declaring [the applicant] qualified to vote." 52 U.S.C. § 10101(e). Far from being "comprehensive," this application procedure is entirely contingent upon the Attorney General and a specific set of facts that excludes a broad swath of potential Materiality Provision claims. The narrow application procedure contained in subsection (e) is thus entirely inapposite to—and in no way "incompatible with"—private enforcement under § 1983. *Abrams*, 544 U.S. at 120. "In focusing on what [Section 10101] contains, [Defendants] ignore what it lacks—a private judicial right of action, a private federal administrative remedy, or any carefu[l] congressional

tailor[ing] that § 1983 actions would distort." *Talevski*, 143 S. Ct. at 1461 (cleaned up) (quotation marks omitted).[6]

Ultimately, Defendants "acknowledge" that "binding circuit precedent exists" holding that the Materiality Provision "is amenable to private enforcement via Section 1983." Defs.' Br. at 32, 34. Specifically, the Eleventh Circuit held in *Schwier* that neither the "provision for enforcement by the Attorney General nor Congress's failure to provide for a private right of action expressly in [the Materiality Provision] *require*[*s*] the conclusion that Congress did not intend such a right to exist." 340 F.3d at 1296. Nonetheless, Defendants "urge" the Court to certify the question of whether the Materiality Provision can be enforced via Section 1983 for interlocutory appeal under 28 U.S.C. § 1292(b) "to repair, or at least clarify, [an alleged] circuit split." Defs.' Br. at 32-33. This request should be denied. *See Baptist Coll. of Fla., Inc. v. Church Mut. Ins. Co.*, No. 5:22cv158-MW/MJF, 2023 WL 4358778, at *1 (N.D. Fla. Mar. 27, 2023) ("an issue of settled law [] prevents this Court from finding that there is a substantial ground for difference of opinion that would permit the certification of an interlocutory appeal").

---

[6] Defendants also argue that the Materiality Provision lacks congressional intent to create a private remedy. Defs.' Br. at 31. This ignores that "[p]laintiffs suing under § 1983 do not have the burden of showing an intent to create a private remedy because § 1983 generally supplies a remedy for the vindication of rights secured by federal statutes." *Gonzaga Univ.*, 536 U.S. at 284.

First and foremost, there is no "substantial ground for difference of opinion" under Section 1292(b). Defendants claim a "one-to-one" circuit split between the Eleventh Circuit in *Schwier* and the Sixth Circuit in *McKay v. Thompson*, 226 F.3d 752 (6th Cir. 2000), but this is a false equivalency. The Sixth Circuit in *McKay* addressed private enforcement of the Materiality Provision in a single sentence. The Eleventh Circuit subsequently devoted several pages to analyzing the issue— including by examining and rejecting *McKay. Schwier,* 340 F.3d at 1294 (tracing *McKay*'s support to two sentences in a 1978 district court decision). And the Eleventh Circuit is not alone; the Third Circuit also recently held that "private plaintiffs have a private right of action to enforce § 10101 under 42 U.S.C. § 1983." *Migliori*, 36 F.4th at 156. The score is therefore not "one-to-one"; it is two thorough, well-reasoned appellate decisions to one sentence.

Nor has there been any intervening change in law that would justify reconsidering *Schwier. Cf. Turquitt v. Jefferson Cnty.*, 137 F.3d 1285, 1287 (11th Cir. 1998) (granting 1292(b) and then en banc review where binding precedent conflicted with more recent decisions of Alabama and U.S. Supreme Courts). The *Schwier* and *Migliori* opinions are entirely consistent with the Supreme Court's recent decision in *Talevski*. There, the Court declined to find incompatibility between a private right of action under Section 1983 and the "detail[ed]" enforcement mechanisms of the Federal Nursing Home Reform Act, because

appellants did not "demonstrate[] that enforcement via § 1983 would thwart the operation of the [] remedial scheme in any respect." 143 S. Ct. at 1460.  So too here.

Given this weight of authority, Defendants' quibbles with the *Schwier* court's methods of analysis fail to establish any basis for interlocutory appeal under Section 1292(b). *See In re 3M Combat Arms Earplug Prod. Liab. Litig.*, No. 3:19md2885, 2020 WL 4756326, at *3 (N.D. Fla. Aug. 17, 2020) ("court[s] must analyze the strength of the arguments … when deciding whether the issue for appeal is truly one on which there is a substantial ground for dispute" (quotation marks omitted)).

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the motions to dismiss.

## <u>LOCAL RULE 7.1(F) CERTIFICATION</u>

The undersigned, Frederick Wermuth, certifies that this motion contains 8,000 words, excluding the case style and certifications.

Dated: July 10, 2023

Respectfully submitted,

Abha Khanna*
**ELIAS LAW GROUP LLP**
1700 Seventh Ave., Suite 2100
Seattle, Washington 98101
Telephone: (206) 656-0177
akhanna@elias.law

*/s/ Frederick S. Wermuth*
Frederick S. Wermuth
Florida Bar No. 0184111
**KING, BLACKWELL, ZEHNDER**
  **& WERMUTH, P.A.**
P.O. Box 1631
Orlando, FL 32802-1631
Telephone: (407) 422-2472
Facsimile: (407) 648-0161
fwermuth@kbzwlaw.com

Justin Baxenberg*
Alexander F. Atkins*
Renata O'Donnell*
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW, Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
jbaxenberg@elias.law
aatkins@elias.law
rodonnell@elias.law

*Counsel for Plaintiffs Vote.Org,*
*Florida Alliance for Retired*
*Americans, Florida State Conference*
*of Branches and Youth Units of the*
*NAACP, and Disability Rights Florida*

*\*Admitted Pro Hac Vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 10, 2023, I filed a copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ *Frederick S. Wermuth*
Frederick S. Wermuth
Florida Bar No.: 0184111
*Counsel for Plaintiffs*
