**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

|  |  |
|---|---|
| VOTE.ORG; FLORIDA ALLIANCE FOR RETIRED AMERICANS; FLORIDA STATE CONFERENCE OF BRANCHES AND YOUTH UNITS OF THE NAACP; and DISABILITY RIGHTS FLORIDA, <br>         *Plaintiffs*, <br><br>     v. <br><br> CORD BYRD, in his official capacity as Secretary of State of Florida, et al., <br>         *Defendants*, <br><br> REPUBLICAN NATIONAL COMMITTEE and REPUBLICAN PARTY OF PASCO COUNTY, <br>         *Intervenor-Defendants.* | No. 4:23-cv-00111-AW-MAF |

**INTERVENORS' REPLY TO THE UNITED STATES'**
**STATEMENT OF INTEREST**

The United States argues that Congress, with a single line in the Civil Rights Act, wiped out longstanding election rules. To make its theory work, the United States contorts the materiality provision into a prohibition on all election regulations that do not prove a voter's qualifications. But that theory rests on many false premises. First, the theory assumes the materiality provision reaches official action that has nothing to do with race, even though the entire statute concerns racial discrimination in voting. Second, the theory assumes Congress could, under the Fifteenth Amendment, wipe out

States' mine-run, nondiscriminatory election rules without making any legislative findings that doing so was necessary to combat racial discrimination. Third, it assumes the materiality provision preempts State law—but nowhere in the provision did Congress indicate it was overriding State election laws. Rather, the provision targets discriminatory, immaterial actions by state officials. The United States has no support for its assumptions beyond a handful of district court cases that largely avoid the key issues. The only appellate decision that has *not* been vacated by the Supreme Court rejected the United States' position. *See Vote.Org v. Callanen*, 39 F.4th 297 (5th Cir. 2022). This Court should too.

Even under their novel theory, Plaintiffs don't state a claim. Original signatures assure the State of the voter's qualifications by deterring fraud and impressing the solemnity of the process. Federal courts must defer to those legitimate State interests, which are "material" to voter qualifications. And the United States has not explained why Plaintiffs' facial challenge is appropriate considering the statute's cure procedures. Most (if not all) applicants will still be able to vote even if they fail to comply with the original-signature requirement the first time around. But Plaintiffs' suit would invalidate the original-signature requirement statewide, not merely as applied to those who, as they contend, were denied the right to vote. The United States' statement of interest fails to revive Plaintiffs' complaint.

## ARGUMENT

**I.     The United States cannot cure Plaintiffs' failure to plead racial discrimination.**

Congress enacted the materiality provision under the Fifteenth Amendment "to insure nondiscriminatory practices in the registration of voters for Federal elections." H.R. Rep. No. 88-914, at 2,394 (1964). Text, context, and caselaw confirm that the statute is aimed at racial discrimination.

*First*, text and context require racial discrimination to show a violation of the statute. The United States argues the Court should, when interpreting subsection (a), ignore subsection (e)'s race-based definition of "qualified under State law" because it defines the term as "used in the subsection." Doc.118 at 13-14. But, as is often true, the words Congress wrote in one part of the statute clarify the meaning of words in the rest of the statute. Subsection (e) sets up a unique remedy for violations of subsection (a). 52 U.S.C. §10101(e). This remedy "comes into play only upon a finding by the Court that persons have been deprived on account of race of subsection (a) rights, and that such deprivation was or is pursuant to a pattern or practice." *Alabama v. United States*, 304 F.2d 583, 592 (5th Cir.), *aff'd*, 371 U.S. 37 (1962). It permits voters of the discriminated-against race to obtain orders "declaring [them] qualified to vote" by showing, among other things, they are "qualified under State law." 52 U.S.C. §10101(e). It makes no sense to assume the meaning of "qualified under State law" for the purpose of this *remedy for* a subsection (a) violation says nothing about the meaning of the same

term in subsection (a). That is especially true because subsection (e)'s definition refers to the violation of subsection (a): "qualified under State law" "shall not, in any event, imply qualifications more stringent than those used by the persons found … to have violated subsection (a) in qualifying persons other than those of the race or color against which the pattern or practice of discrimination was found to exist." *Id.*[1]

The United States responds that subsection (e)'s definition is irrelevant because it applies only to enforcement actions under subsection (c), but that's a nonstarter. Doc.118 at 14. Before the Eleventh Circuit extended enforcement of §10101 to private parties, every §10101 suit fell under subsection (c). And that meant the statutory definitions applied in all §10101 suits. Allowing private parties to sue under §10101 does not change the definitions in the statute or the elements of a violation. *See Schwier v. Cox*, 340 F.3d 1284, 1296 (11th Cir. 2003). The same definitions of "vote" and "under State law" apply regardless of whether the plaintiff is a private party or the Attorney General. Other courts have thus recognized the definitions in subsection (e) apply throughout the statute, regardless of who sues. *Common Cause v. Thomsen*, 574 F.Supp.3d 634, 636 n.4 (W.D.Wis. 2021) ("The definitions set out in subsection (e) apply '[w]hen used in

---

[1] The United States might be correct that not every case is a "pattern or practice" case. A party could arguably prove *individual* racial discrimination, then the Attorney General could extend relief to nonparties under subsection (e) by showing that the discrimination was part of a larger "pattern or practice." Here, that is beside the point, as Plaintiffs are four nonprofits that can't possibly allege racial discrimination against themselves. To obtain relief on their allegations as to unnamed members, they would at least have to show a "pattern or practice" of racial discrimination against those members.

this subsection.' But subsection (e) provides the enforcement mechanism for the section, including subsection (a). So the statutory structure makes it clear that the definitions in subsection (e) must apply throughout §10101.").

Under the United States' interpretation, §10101 would prohibit one thing when it sues and another (much more expansive) thing when a private party sues. But the statute can't mean two different things. As courts have recognized for years, racial discrimination is an element of §10101 suits. *Malinou v. Bd. of Elections*, 271 A.2d 798, 803 (R.I. 1970) (dismissing a §10101 challenge to Rhode Island's minimum signature requirement because "[n]owhere in [the] record is there the slightest hint that the state board disallowed the disputed signatures because of the 'race, color, or previous condition of [servitude]' of either the signatories or the candidate whose nomination papers they signed"). That is true regardless of who initiates the suit.

The United States misconstrues neighboring provisions in §10101 to read racial discrimination out of the materiality provision. The United States says §10101(a)(1) "already covers the waterfront of direct racial discrimination." Doc.118 at 15. But that provision "explicitly stated the *legislative purpose* of protecting the rights of colored citizens to vote notwithstanding 'any constitution, law, custom, usage, or regulation of any State.'" *United States v. Mississippi*, 380 U.S. 128, 138 (1965) (emphasis added). The rest of the statute "furnishes an adequate machinery for effective enforcement of this policy." *Alabama*, 304 F.2d at 589. In other words, subsection (a)(1) clarifies the rights that the rest of the statute protects through prohibitions on state officials. So subsection

5

(a)(1)'s focus on racial discrimination only confirms that the entire statute concerns racial discrimination in voting and voter registration.

*Second*, the United States has failed to square its reading with Congress's Fifteenth Amendment authority. *South Carolina v. Katzenbach*, 383 U.S. 301 (1966), demonstrates the constitutional problems with its position. In *Katzenbach*, the Supreme Court upheld the coverage formula in the Voting Rights Act that required certain States to preclear their election laws with the federal government. In 1966, such an "uncommon exercise of congressional power" was justified by "exceptional conditions." *Id.* at 334. More recently, however, the Supreme Court found that current conditions do not justify the sweeping reach of the preclearance requirement. *Shelby Cnty. v. Holder*, 570 U.S. 529, 556-57 (2013). The United States argues "the *McCulloch* rationality test" applies, Doc.118 at 17-18, but that "proceeds from a flawed premise" that *Shelby County* rejected, 570 U.S. at 555. Rather, under the Fifteenth Amendment, "a statute's 'current burdens' must be justified by 'current needs.'" *Id.* at 550-51.

The United States suggests that Congress may impose burdens that "extend beyond bans on intentional racial discrimination," Doc.118 at 17, but its only support is the VRA's preclearance coverage formula, which *Shelby County* said goes too far. If Congress intended §10101 to apply beyond racial discrimination claims, it must justify that application with "current data reflecting current needs," *Shelby Cnty.*, 570 U.S. at 553, not with the 1960s evidence the United States cites, Doc.118 at 18-19. Construing the statute to require racial discrimination as an element—as courts have for decades—

6

avoids those problems. *E.g.*, *Clark v. Marengo Cnty.*, 469 F.Supp. 1150, 1176 (S.D.Ala. 1979) (concluding, after "exhaustively consider[ing]" the text "and the legislative history behind the adoption of the statute," that the section is "a statutory embodiment of the Fifteenth Amendment intended only to preclude denials by persons acting under color of state law of the right to vote to other persons where such denial is based upon race, color, or previous condition of servitude"). The Fifteenth Amendment does not give Congress a blank check to take actions that have nothing to do with combatting racial discrimination.

## II.     The materiality provision does not preempt state election laws.

The materiality provision applies only to state action that exceeds the bounds of state law. The United States pushes a new theory of §10101 that would preempt state law itself. *See* Doc.118 at 23-27. That theory has performed poorly so far. The Third Circuit adopted it in a now-vacated decision. *Migliori v. Cohen*, 36 F.4th 153 (3d Cir.), *judgment vacated sub nom. Ritter v. Migliori*, 143 S.Ct. 297 (2022). At least three Supreme Court Justices agreed that "[t]he Third Circuit's interpretation broke new ground," and was "very likely wrong." *Ritter v. Migliori*, 142 S.Ct. 1824 (2022) (Alito, J., dissental). The Pennsylvania Supreme Court also declined to adopt the theory. *Ball v. Chapman*, 289 A.3d 1, 23-28 (Pa. 2023) (plurality op.). The rocky history of these rulings is unsurprising. Plaintiffs' theory is new, and it is wrong.

The United States points out that no court has held that the materiality provision doesn't preempt state law. That's because many of these cases exhibited a "lack of

genuine disagreement [between the parties] on key questions." *Migliori*, 36 F.4th at 164 (Matey, J., concurring). When opposed, Plaintiffs' theory falls apart. As early as the 1990s, courts observed that "the jurisprudence appears to demonstrate that [§10101] is an anti-discrimination statute designed to eliminate the discriminatory practices of registrars through *arbitrary enforcement* of registration requirements." *McKay v. Altobello*, No. 1:96-cv-3458, 1996 WL 635987, at *1 (E.D.La. 1996) (emphasis added); *see also Condon v. Reno*, 913 F.Supp. 946, 950 (D.S.C. 1995) (noting Congress enacted the materiality provision "to sweep away such tactics as disqualifying an applicant who failed to list the exact number of months and days in his age"); *United States v. Ramsey*, 331 F.2d 824, 828 (5th Cir. 1964) (rejecting the argument that it could order registrars to change the "specific requirements to enable a man to register" to vote when doing so would contravene what was required under state law); Doc.118 at 26 (citing 1961 Commission Report, which discussed registrars who were inconsistently and discriminatorily applying the birthdate requirement). The United States relies on scattershot district court cases decided long after the bulk of litigation occurred under the materiality provision. Those cases do not rebut the weight of authority applying the provision to cases of explicit racial discrimination.

The United States' theory has fallen apart for good reason: it is unsupported by the text. The materiality provision prohibits actions denying the right to vote based on errors or omissions that are "not material in determining whether [an] individual is qualified under State law to vote." 52 U.S.C. §10101(a)(2)(B). The qualifications are

established "under State law." *Id.* The United States would transform that prohibition into an authority to review qualifications established by States to decide whether they are really material. The United States offers no textual support for that position. Instead, it says a court must identify a State's "substantive voter qualifications" as opposed to the other qualifications to vote. Doc.118 at 24. That distinction cannot be found in the words of the materiality provision.

III.    **There are no factual disputes about Florida's justifications for the original-signature requirement.**

The United States admits that original signatures *could be* material in determining a voter's qualifications, but it argues that is a factual question, not a legal one. *See* Doc.118 at 22. The United States does not explain that conclusion. *See id.* In any event, it is wrong, and it misunderstands the State's justifications for the law.

*First*, the Court needs no evidence to observe that an original signature demonstrates the applicant has subscribed the constitutional oath and sworn that the information is correct. The oath is required by the Florida Constitution, and the affirmation signature is required by statute. The United States does not contest the materiality of signatures themselves. But "the general requirement that an application be 'signed by the applicant' is no more or less material under [§10101] than the requirement that an application [accord with] the wet signature requirement." *Vote.Org*, 39 F.4th at 307. Because "Vote.org cannot logically maintain that the one is valid and the other not," no evidence is necessary to rebut their complaint. *Id.*

Moreover, "[p]hysically signing a voter registration form and thereby attesting, under penalty of perjury, that one satisfies the requirements to vote carries a solemn weight that merely submitting an electronic image of one's signature via web application does not." *Id.* at 308. A signature is material because it "impresses upon the signers … the seriousness of the act of signing." *Howlette v. City of Richmond*, 485 F.Supp. 17, 23 (E.D.Va. 1978) (dismissing a materiality-provision challenge to Virginia's notarization requirement for referendum petitions), *aff'd*, 580 F.2d 704 (4th Cir. 1978). The solemnity of that process is a state interest that has "has independent significance." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 197 (2008). These state interests are not (and have never been treated as) questions of fact. The State need not present evidence justifying them.

*Second*, the State adopted the original-signature requirement to deter fraud. "[D]eterring voter fraud is a legitimate policy on which to enact an election law, even in the absence of any record evidence of voter fraud." *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1334 (11th Cir. 2021). Indeed, "it should go without saying that a State may take action to prevent election fraud without waiting for it to occur and be detected within its own borders." *Brnovich v. Democratic Nat'l Comm.*, 141 S.Ct. 2321, 2348 (2021). Unlike constitutional claims that require balancing benefits and burdens of election laws, the materiality provision "does not establish a least-restrictive-alternative test for voter registration applications." *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1175 (11th Cir. 2008). It does not apply so long as

10

an error or omission is "material in determining" a voter's qualifications. 52 U.S.C. §10101(a)(2)(B). It would thus be inappropriate to inquire into the effectiveness of the State's policy decision: "While the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear." *Crawford*, 553 U.S. at 196. Because "actual evidence of voter registration fraud 'has never been required to justify a state's prophylactic measures to decrease occasions for vote fraud or to increase the uniformity and predictability of election administration,'" this Court need not wait for such evidence to dismiss Plaintiffs' claim. *Vote.Org*, 39 F.4th at 308 (citation omitted).

**IV.    The United States cannot explain how voters who have been given the opportunity to cure deficiencies in their application are denied the right to vote.**

The original-signature requirement cannot be facially unlawful when voters have an opportunity to cure deficiencies in their registration applications. A voter who cures her application and then votes has not been denied "the right … to vote." 52 U.S.C. §10101(a)(2)(B). Some might view the signature and cure process as "a de minimis burden" for the voter, *Vote.Org*, 39 F.4th at 307, but the materiality provision does not prohibit such burdens, *Browning*, 522 F.3d at 1175. Likewise, a voter who cures her application and decides not to vote has not been denied the right to vote, nor has a voter who chooses not to cure her application. Plaintiffs' facial challenge sweeps in all these voters, none of whom could state a claim under the materiality provision. "Even the most permissive voting rules must contain some requirements, and the failure to

11

follow those rules constitutes the forfeiture of the right to vote, not the denial of that right." *Ritter*, 142 S.Ct. at 1825 (Alito, J., dissental).

In response, the United States argues that "restrictions on *registration* have long been viewed as denying the right to *vote*." Doc.118 at 27-29. That's true, but irrelevant. No one argues that the materiality provision doesn't apply to voter registration. That does not change that the cure process vitiates Plaintiffs' facial challenge. Given "the opportunity to cure" under the statute, "it is hard to conceive how the wet signature rule deprives anyone of the right to vote." *Vote.Org*, 39 F.4th at 306. Conceivably, some applicants could have their applications denied and be unable to cure. But the complaint doesn't allege such a person even exists. And the United States doesn't address it.

For similar reasons, the United States' reliance on the statutory definition of "vote" does not advance its position. No one disputes that the term "vote" reaches "all action necessary to make a vote effective including … registration." 52 U.S.C. §10101(a)(3)(A), (e). But it does not follow that an individual who has failed to meet the registration requirements but has been given an opportunity to cure has been "den[ied] the right … to vote." *Id.* §10101(a)(2)(B).

The district court decisions the United States cites fail to support Plaintiffs' facial challenge. *See La Union del Pueblo Entero v. Abbott*, 604 F.Supp.3d 512, 541 (W.D.Tex. 2022); *Sixth Dist. of Afr. Methodist Episcopal Church v. Kemp*, 574 F.Supp.3d 1260, 1282 (N.D.Ga. 2021). Neither case addressed the distinction between a facial challenge and an as-applied challenge. And both offered terse analysis that did not explain how the

statute that provides an opportunity to cure could be deemed to categorically deny the right to vote. Registration necessarily requires some back-and-forth with voters. The materiality provision does not create a cause of action to invalidate state law at the very beginning of that process.

## CONCLUSION

For the foregoing reasons, the Court should reject the arguments made by the United States and dismiss Plaintiffs' Amended Complaint.

Dated: July 31, 2023

Thomas R. McCarthy*
Cameron T. Norris*
Gilbert C. Dickey*
Conor D. Woodfin*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
cam@consovoymccarthy.com
gilbert@consovoymccarthy.com
conor@consovoymccarthy.com

Tyler R. Green*
CONSOVOY MCCARTHY PLLC
222 S. Main Street, 5th Floor
Salt Lake City, UT 84101
tyler@consovoymccarthy.com

*admitted *pro hac vice*

Respectfully submitted,

 */s/ Daniel E. Nordby*

Daniel E. Nordby
Fla. Bar No. 14588
Benjamin J. Gibson
Fla. Bar No. 058661
SHUTTS & BOWEN LLP
215 South Monroe Street, Suite 804
Tallahassee, Florida 32301
Tel: (850) 241-1717
dnordby@shutts.com
bgibson@shutts.com

*Counsel for Intervenor-Defendants the Republican National Committee and the Republican Party of Pasco County*

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)**

This document contains 3,198 words, excluding what can be excluded under the

Local Rules.

*/s/ Daniel E. Nordby*

**CERTIFICATE OF SERVICE**

I e-filed this document, which will serve all parties whose counsel have entered

appearances. Those parties who have not yet appeared will be served via email.

*/s/ Daniel E. Nordby*