IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

**VOTE.ORG, et al.,**

    **Plaintiffs,**

v.                                                   Case No. 4:23-cv-111-AW-MAF

**CORD BYRD, in his official capacity as
SECRETARY OF STATE OF
FLORIDA, et al.,**

    **Defendants,**

**REPUBLICAN NATIONAL
COMMITTEE and REPUBLICAN
PARTY OF PASCO COUNTY,**

    **Intervenor-Defendants.**

_____/

## **ORDER GRANTING MOTIONS TO DISMISS**

Before they can vote, Floridians must first register. And when they register, they must include a signature on their registration form. Under current Florida law, that signature must be either an "original signature" or a "digital signature transmitted by the Department of Highway Safety and Motor Vehicles." Fla. Stat. § 97.053(5)(a)(8). The question in this case is whether Florida's law complies with a federal law that keeps states from using immaterial errors or omissions to deny the right to vote.

Plaintiffs—several advocacy organizations focused on voting rights—sued to enjoin the law's enforcement. ECF No. 1. Defendants are the Florida Secretary of

1

State and each of Florida's sixty-seven supervisors of election. ECF No. 101. Two political organizations intervened as additional Defendants. ECF No. 85.

There are two pending motions to dismiss: one from the Intervenors (ECF No. 111) and one from the Secretary and ten Supervisors (the "Moving Defendants") (ECF No. 112). (The other fifty-seven Supervisors have answered the First Amended Complaint. ECF Nos. 108, 109, 110, 114.) The United States submitted a "Statement of Interest," arguing that the court should deny the motions to dismiss. ECF No. 118.

Having carefully considered the parties' arguments, I now grant the motions.

## I.

Before turning to the merits, I must address the issue of this court's jurisdiction, which the Constitution limits to "Cases" and "Controversies," U.S. Const. art. III, § 2. One "essential and unchanging part of the case-or-controversy requirement" is standing. *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1296 (11th Cir. 2019) (en banc) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "The doctrine of standing . . . requires federal courts to satisfy themselves that the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (cleaned up).

To establish standing, a plaintiff must show "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) (citing *Lujan*, 504 U.S. at 560-61). Ultimately, a plaintiff must prove these three elements, but at the pleading stage, a plaintiff need only allege facts that would support them. *See Lujan*, 504 U.S. at 561; *see also Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1233 (11th Cir. 2008) (noting the need to "sufficiently allege[] a basis" for each element). And at this stage, the court accepts as true the complaint's factual allegations. *Morrison v. Amway Corp.*, 323 F.3d 920, 924 n.5 (11th Cir. 2003).

Here, Plaintiffs are organizations, which means they have two avenues to show standing: through their members (associational standing) or through an injury to themselves that is traceable to and redressable by Defendants (organizational standing). *Georgia Ass'n of Latino Elected Officials, Inc. v. Gwinnett Cnty. Bd. of Registration & Elections*, 36 F.4th 1100, 1114 (11th Cir. 2022). Plaintiffs assert standing through both avenues; the Moving Defendants dispute standing altogether.[1]

---

[1] The Intervenors do not challenge Plaintiffs' standing. But regardless of the parties' views on standing, the court has an independent obligation to address it. *See Mirage Resorts, Inc. v. Quiet Nacelle Corp.*, 206 F.3d 1398, 1400-01 (11th Cir. 2000).

3

Plaintiffs have alleged enough to show that at least one of them has standing. Specifically, Plaintiffs have alleged sufficient facts that, taken as true, show the NAACP has organizational standing under a diversion-of-resources theory. This makes it unnecessary to address the parties' arguments as to the other Plaintiffs' standing or as to the NAACP's associational standing. *See Georgia Ass'n of Latino Elected Officials, Inc.*, 36 F.4th at 1113.

Under a diversion-of-resources theory, "an organization has standing 'if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts.'" *Id.* at 1114 (quoting *Jacobson*, 974 F.3d at 1250). Here, Plaintiffs allege that the challenged provision "forces Florida NAACP to divert valuable resources to helping registrants who cannot use Florida's other methods of registration to print, sign, and physically return their voter registration applications." ECF No. 101 ¶ 21. They further allege that "Florida NAACP also must divert valuable resources to engage in additional door-to-door canvassing activities to ensure that potential voters who cannot register online and lack easy access to printers are registered." *Id.* ¶ 22.

The Moving Defendants complain that Plaintiffs have not detailed where these resources will be diverted *from*. ECF No. 112 at 23-24 (citing *Georgia Ass'n*).[2]

---

[2] All page citations are to the blue, CM/ECF generated numbers.

4

But Plaintiffs allege several specific Florida NAACP projects and programs, they allege that Florida NAACP has limited resources, and they allege that the work Florida NAACP does to address the harms at issue takes away from other projects. ECF No. 101 ¶¶ 18-21; *accord id*. ¶ 20 ("The resources and effort expended in one area necessarily detract from the resources and effort available for Florida NAACP to direct to others."). At the pleading stage, where Plaintiffs only have to allege facts plausibly showing standing, and where the court must draw all reasonable inferences in Plaintiffs' favor, Plaintiffs have alleged enough. *Cf. Muransky v. Godiva Chocolatier, Inc*., 979 F.3d 917, 933-34 (11th Cir. 2020) (en banc) (noting that *Ashcroft v. Iqbal*, 556 U.S. 662 (2007), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2009), "have put a finer point on" the standard requiring plaintiffs to set forth facts satisfying standing).

Indeed, the situation here is not appreciably different from that in *Georgia Association of Latino Elected Officials*, where the court found a "broad allegation of diversion of resources [to be] enough at the pleading stage." 36 F.4th at 1115 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)); *see also Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1166 (11th Cir. 2008) ("Instead of 'abstract social interests,' the plaintiffs have averred that their actual ability to conduct specific projects during a specific period of time will be frustrated by [the challenged law's] enforcement. Even though the injuries are anticipated rather than

completed events, they satisfy the immediacy and likelihood requirements . . . and for those reasons, the Secretary's argument that the organizational injuries are not concrete or particularized fails."); *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1350 (11th Cir. 2009) (holding the NAACP established organizational standing when the statute at issue would affect NAACP's voter registration efforts by "divert[ing] volunteers and resources from getting voters to the polls to helping them obtain acceptable photo identification" (cleaned up)).

## II.

The Moving Defendants separately argue that Plaintiffs lack "prudential standing," ECF No. 112 at 25, pointing to "the rule that a party 'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). They further argue that Plaintiffs "do not have standing to challenge the Materiality Provision under Section 1983." ECF No. 112 at 28. These "standing" issues both boil down to whether organizations like Plaintiffs have a statutory right to enforce the Materiality Provision, which provides rights to *voters*.[3]

---

[3] The Moving Defendants also argue that private parties cannot sue to enforce the Materiality Provision under § 1983. ECF No. 112 at 31. There is a Circuit split on that issue. *Compare McKay v. Thompson*, 226 F.3d 752, 756 (6th Cir. 2000), *with Schwier v. Cox*, 340 F.3d 1284, 1297 (11th Cir. 2003). But as the Moving Defendants

6

The Moving Defendants offer a persuasive argument on these points, and they have support from a recent Fifth Circuit decision. In *Vote.Org v. Callanen*, 39 F.4th 297 (5th Cir. 2022), the court stayed a district court's order that preliminarily enjoined Texas's "wet signature" requirement. *Id.* at 309. It concluded that the organizational plaintiff lacked third-party standing. *Id.* at 304. And it found strength in defendants' argument that § 1983 gave the organizational plaintiffs no right to sue on behalf of voters. *Id.* at 305 ("Without an arguable cause of action, Vote.org lacks statutory standing and the defendants appear poised for merits success on this basis too.").

In response, Plaintiffs first say the plain text of the Civil Rights Act "contemplates a cause of action for Plaintiffs' organizational injuries." ECF No. 119 at 26. But the only text they cite is the provision establishing district courts' jurisdiction over "proceedings instituted pursuant to this section" and directing courts to exercise that jurisdiction "without regard to whether the party aggrieved shall have exhausted any administrative or other remedies that may be provided by law." 52 U.S.C. § 10101(d); *see also* ECF No. 119 at 26. It is difficult to read this anti-exhaustion text as Congress's establishing a statutory claim for any plaintiff

---

acknowledge, there is binding Eleventh Circuit precedent holding that the Materiality Provision "may be enforced by a private right of action under § 1983." *Schwier*, 340 F.3d at 1297.

with Article III standing—no matter how tangentially affected by a Materiality Provision violation.

This is true even though the statute uses the phrase "party aggrieved." Plaintiffs cite *Trafficante v. Metropolitan Life Insurance Company*, 409 U.S. 205 (1972), in which the Supreme Court found a different statute's words "showed 'a congressional intention to define standing as broadly as is permitted by Article III.'" *Id.* at 209. But that statute—which addressed housing discrimination—defined "person aggrieved" broadly as "(a)ny person who claims to have been injured by a discriminatory housing practice." *Id.* at 208 (quoting statute). So it reached white tenants who "had lost the social benefits of living in an integrated community" because of discrimination against their neighbors. *Id.* Similarly, the statute in *Federal Election Commission v. Akins*, 524 U.S. 11 (1998), which Plaintiffs also cite, "specifically provided . . . that '[a]ny person who believes a violation of this Act . . . has occurred'" could file an administrative complaint and then (if that complaint were dismissed) a district court action. *Id.* at 19 (quoting statute).

Plaintiffs' cases thus provide little support for their position that *anyone* can sue under the Materiality Provision so long as they claim injury from denial of someone else's right to vote. *Cf. Lexmark Int'l v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014) ("Read literally, that broad language might suggest that an action is available to anyone who can satisfy the minimum requirements of Article

III. No party makes that argument, however, and the unlikelihood that Congress meant to allow all factually injured plaintiffs to recover persuades us that [the statute] should not get such an expansive reading." (cleaned up)); *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 265-66 (1992) (concluding that statutory language providing that "[a]ny person injured in his business or property by reason of a violation of [the federal statute] may sue therefor" did not mean that any plaintiff injured "by reason of" the violation could sue).

In sum, the Moving Defendants argue with some force that the court should dismiss on prudential grounds. But I ultimately need not decide whether the Moving Defendants are correct on that point because I agree with them on the merits, which present more straightforward issues. Unlike Article III standing, Defendants' prudential arguments do not implicate the court's subject-matter jurisdiction, so it is not necessary to further address them. *See United States v. Blake*, 868 F.3d 960, 970 (11th Cir. 2017) ("Because prudential standing is flexible and not jurisdictional in nature, and deciding that issue will not affect the result in this case, we can bypass it and reach the less difficult issue . . . ." (cleaned up)); *see also Newton v. Duke Energy Fla., LLC*, 895 F.3d 1270, 1274 n.6 (11th Cir. 2018) ("Under *Lexmark*, the question is whether Plaintiffs have a valid cause of action, and the absence of a valid cause of action does not implicate subject-matter jurisdiction." (cleaned up)); *Kowalski*, 543 U.S. at 129 (noting distinction between Article III jurisdiction and

"the alternative threshold question [of] whether [plaintiffs] have standing to raise the rights of others").

**III.**

Turning to the merits, the Moving Defendants and the Intervenors argue that Plaintiffs fail to state a claim. To survive a motion to dismiss, a complaint must contain "a short and plain statement of the claim" that—when ignoring legal conclusions but taking all factual allegations as true—show the pleader is entitled to relief. *Iqbal*, 556 U.S. at 663.

Under Florida law, citizens wishing to vote must first register. *See Browning*, 522 F.3d at 1156. And to register, they must complete a voter registration application, providing certain information:

> A voter registration application is complete if it contains the following information necessary to establish the applicant's eligibility pursuant to § 97.041, including . . . The original signature or a digital signature transmitted by the Department of Highway Safety and Motor Vehicles of the applicant swearing or affirming under the penalty for false swearing pursuant to § 104.011 that the information contained in the registration application is true and subscribing to the oath required by § 3, Art. VI of the State Constitution and § 97.051.

Fla. Stat. § 97.053(5)(a)8.

So under Florida law, a voter registration requires *either* an original signature or a digital signature that the Department of Highway Safety transmitted.[4] Either way, the signature is the applicant's "swearing or affirming" that the information provided is correct. It is also the applicant's "subscribing to the oath" the Florida Constitution requires. *Cf.* Fla. Const. art. VI, § 3 ("Each eligible citizen upon registering shall subscribe the following: 'I do solemnly swear (or affirm) that I will protect and defend the Constitution of the United States and the Constitution of the State of Florida, and that I am qualified to register as an elector under the Constitution and laws of the State of Florida.'").

Plaintiffs do not contend that the Department of Highway Safety avenue is unlawful, and they say they do not challenge the requirement for a signature generally. Their only contention is that for voters lacking a "signature transmitted by the Department," the requirement for an "original" signature is too much. In Plaintiffs' view, federal law requires states to accept photocopies, facsimiles, electronic checkmarks, or something other than an original signature.[5]

---

[4] The parties agree that Florida requires a "wet" signature—one made by the signor himself. Plaintiffs note that Florida officials "interpret this to mean that paper applications must be rejected unless they include the applicant's handwritten signature in wet-ink." ECF No. 119 at 3-4. Plaintiffs do not dispute this interpretation or offer a plausible contrary interpretation.

[5] Plaintiffs never detail what types of *unoriginal* signatures should suffice, but they complain that applications "with any other type of signature—e.g., an electronic

The federal law at issue, often called the Materiality Provision, provides that voters should not lose the right to vote "because of an error or omission" on a registration application "if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B). Congress originally enacted the Materiality Provision as part of the Civil Rights Act of 1964. *Browning*, 522 F.3d at 1173.[6] Some of Congress's earlier enactments turned out to be "unsuccessful attempts to counteract state and local government tactics of using, among other things, burdensome registration requirements to disenfranchise African-Americans." *Id.* (citing *Condon v. Reno*, 913 F. Supp. 946, 949-50 (D.S.C. 1995). The Materiality Provision—enacted in the same era in which Congress addressed literacy tests—"was necessary to sweep away such tactics as disqualifying an applicant who failed to list the exact number of months and days in his age." *Condon*, 913 F. Supp. at 950.

That Congress enacted the Materiality Provision to tackle racial discrimination does not, though, mean the provision applies only to racially discriminatory practices. *See Browning*, 522 F.3d at 1173 ("[W]e recognize that

---

or imaged signature—will be rejected." ECF No. 119 at 4; *cf. id.* at 7 ("[W]hether a voter provides a signature by pen, e-signature, or otherwise provides no insight into a voter's qualifications to register . . . .").

[6] The provision, previously codified as 42 U.S.C. § 1971(a)(2)(B), now appears at 52 U.S.C. § 10101(a)(2)(B).

Congress in combating specific evils might choose a broader remedy. The text of the resulting statute, and not the historically motivating examples of intentional and overt racial discrimination, is thus the appropriate starting point of inquiry in discerning congressional intent." (citations omitted)). The Intervenors—but not the Secretary—argue that Plaintiffs must show racial discrimination to succeed. ECF No. 111 at 9-11. They contend their argument flows from the text, but the Materiality Provision's text says nothing about race or racial discrimination. It says simply that no person acting under color of state law may deprive someone of the right to vote based on an immaterial error or omission. That text covers a state actor motivated by racial discrimination. It also covers a state actor *not* motivated by racial discrimination. It is therefore unsurprising that the Eleventh Circuit has found a Materiality Provision violation without mentioning racial discrimination. *See Schwier v. Cox*, 439 F.3d 1285, 1286 (11th Cir. 2006) (affirming district court decision holding that under Materiality Provision, "Georgia cannot mandate disclosure of SSNs because such information is not 'material' to a voter registration system"); *see also Browning*, 522 F.3d at 1174 (addressing Materiality Provision issue on the merits without addressing whether there was showing of racial discrimination); *Diaz v. Cobb*, 435 F. Supp. 2d 1206, 1211 (S.D. Fla. 2006) (same).[7]

---

[7] It is true, as the Intervenors note, ECF No. 111 at 14, that because *Browning* found the challenged state-law features material, a racial-discrimination prerequisite

13

The Intervenors—but again not the Secretary—also argue that Congress enacted the Materiality Provision pursuant to its Fifteenth Amendment powers and that, therefore, the provision's application must be limited to racially discriminatory practices. ECF No. 111 at 11. They present this as a constitutional avoidance argument: rather than explicitly argue that Congress lacked authority to enact a Materiality Provision applying beyond race-based discrimination, they argue the interpretive principle that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988). But that rule cannot justify a "construction [that] is plainly contrary to the intent of Congress." *Id.* And limiting the Materiality Provision's reach as the Intervenors suggest would require rewriting the provision—not just interpreting it. Moreover, the Intervenors have not shown that interpreting the Materiality Provision as written "would raise serious constitutional problems."

The real question is whether Plaintiffs have alleged facts plausibly showing that the wet-signature requirement is immaterial. They have not.

---

would not have changed the outcome. Still, one would not expect the Eleventh Circuit to ignore the omission of a threshold statutory showing. Regardless, in *Schwier*, the outcome *would have* been different.

14

Plaintiffs contend "a 'wet' signature on an application tells election officials nothing about whether the applicant is qualified under Florida law." ECF No. 119 at 4. They contend it "bears no relation to the statutory qualifications," the applicant's age, citizenship, and residence. ECF No. 101 ¶ 51 (citing Fla. Stat. § 97.041(1)(a)). But they do not argue the same for any signature requirement. *Cf. Callanen*, 39 F.4th at 307 (noting a logical inconsistency when plaintiff argued against one—but not the other—statutory requirement when the two "fall or stand together"). Instead, they contend "the act of signing—rather than the method used—affirms the information provided is true and accurate." ECF No. 119 at 11.

Plaintiffs' entire premise is that a copied, faxed, or otherwise non-original signature is equal in stature to an original, wet signature. But we know this not to be so. "Physically signing a voter registration form and thereby attesting, under penalty of perjury, that one satisfies the requirements to vote carries a solemn weight that merely submitting an electronic image of one's signature via web application does not." *Callanen*, 39 F.4th at 308; *cf. Howlette v. City of Richmond*, 485 F. Supp. 17, 23 (E.D. Va. 1978), *aff'd*, 580 F.2d 704 (4th Cir. 1978) ("[I]ndividual notarization requirement impresses upon the signers of the petitions the seriousness of the act of signing a petition . . . ."). Indeed, because original signatures carry different weight than other "signatures," society is replete with examples of original-signature

15

requirements. The Intervenors cite several, *see* ECF No. 111 at 2-3, but everyone has encountered some, and no one here disputes the ubiquity of these requirements.

It is true that times are changing and that electronic signatures are acceptable in situations they once were not. *See* ECF No. 118 at 21 (noting modern technology and legislation such as the Global and National Commerce Act and Uniform Electronic Transaction Act). But the acceptance of electronic signatures in certain circumstances does not render the wet signature requirement immaterial in this circumstance. *See Browning*, 522 F.3d at 1175. ("[The law] does not establish a least-restrictive-alternative test for voter registration applications . . . .").

I acknowledge that another district court has allowed this same claim to survive a motion to dismiss. In *Vote.org v. Georgia State Election Board*, -- F. Supp. 3d ----, 2023 WL 2432011 (N.D. Ga. Mar. 9, 2023), the court concluded that "[e]ven if Defendants can later prove that requiring applicants to sign in pen and ink is vital to protecting the security of the application or that the signature shows that that the applicant has carefully considered his or her decision," the court would not consider those arguments at the motion-to-dismiss stage. *Id.* at *8. But the question is whether Plaintiffs' allegations here plausibly show that the wet-signature requirement is immaterial, and I conclude they do not.[8] *Cf. Diaz*, 435 F. Supp. 2d at 1211-15

---

[8] Defendants also argue the Materiality Provision does not displace state law. ECF No. 111 at 12-15, ECF No. 112 at 12-14. In other words, they argue, because

(dismissing under Rule 12(b)(6) a claim that Florida's requiring applicants to check a box confirming they were eligible—even though they also had to sign an oath confirming eligibility—violated the Materiality Provision).[9]

---

state law requires an original signature, that signature is per se material. This argument finds some support in case law. *See Callanen*, 39 F.4th at 307; *cf. Schwier v. Cox*, 412 F. Supp. 2d 1266 (N.D. Ga. 2005), *aff'd*, 439 F.3d 1285 (11th Cir. 2006) ("[D]isclosing one's SSN cannot be material in determining whether that person is qualified to vote under Georgia law, if Georgia [by state statute] is not permitted to require this disclosure."). At any rate—because I find the wet signature requirement is material—I need not reach a decision as to the state law issue. And I need not reach a decision as to Defendants' opportunity-to-cure arguments, ECF No. 111 at 19-20, ECF No. 112 at 10, for the same reason.

[9] The district court summarized the plaintiffs' Materiality Provision claim this way:

> By signing the oath on the bottom of the Florida application, the applicant affirms that he is "qualified to register as an elector under the Constitution and laws of the State of Florida," which qualifications are enumerated both on the top of the form and in the text of the check-boxes. Since those qualifications include 1) being a citizen; 2) not being a convicted felon whose rights have not been restored; and 3) not being currently adjudicated mentally incapacitated with respect to voting, so the Plaintiffs argue, rejecting applications for failure to check the check-boxes explicitly affirming those qualifications individually is to require information that is redundant and therefore immaterial, in violation of the VRA. Plaintiffs do not challenge the presence of the check-boxes under this provision, which may serve a signaling function, but rather the policy, now mandated by Florida statute, that requires applications to be rejected for failure to check the appropriate boxes.

*Diaz*, 435 F. Supp. 2d at 1211-12 (footnote omitted). It concluded that "[e]ven if the check-boxes were duplicative of the oath, failing to check one or more boxes would not be an immaterial omission under the VRA." *Id.* at 1213.

17

## Conclusion

The motions (ECF Nos. 111, 112) are GRANTED, and the claims against the movants are dismissed for failure to state a claim.

Many other Defendants have filed answers and did not join the motion, but the claims for relief are all the same. Within fourteen days, Plaintiff must file a response showing why—considering the ruling above—the court should not dismiss claims against all Defendants and enter final judgment. Any Defendant may file a response within fourteen days thereafter.

SO ORDERED on October 30, 2023.

s/ *Allen Winsor*
United States District Judge
